# STATE OF MICHIGAN

# COURT OF APPEALS

KRISTEN ALISE FALCONER,

Plaintiff-Appellant,

v

CHADWICK JASON STAMPS a/k/a CHAD MEYERS,

Defendant,

and

DONNA BRYANT WEDDINGTON,

Intervener-Appellee.

FOR PUBLICATION
December 22, 2015
9:00 a.m.

No. 323392
Calhoun Circuit Court
LC No. 2013-003920-DC

Before: GADOLA, P.J., and K. F. KELLY and FORT HOOD, JJ.

K. F. KELLY, J.

In a three-way child custody dispute involving plaintiff mother, Kristen Alise Falconer (plaintiff), defendant father, Chadwick Jason Stamps a/k/a Chad Meyers (defendant), and paternal grandmother, Donna Bryan Weddington (Intervener), plaintiff appeals as of right because, while plaintiff was awarded sole physical and legal custody of the child, the order included extensive grandparenting time with Intervener. We vacate that portion of the trial court's order that granted Intervener grandparenting time where the issue of grandparent visitation was not properly before the trial court.

## I. BASIC FACTS AND PROCEDURAL HISTORY

### A. PROBATE COURT PROCEEDINGS

On October 14, 2010, Intervener filed a petition for appointment of a full guardianship of the two-year-old child under MCL 700.5204(2). Intervener told the probate investigator that plaintiff and defendant lived with Intervener before the child was born and that all three continued to live with Intervener until defendant moved to Arizona to attend college in February 2010 and plaintiff followed in April 2010. Intervener reported that plaintiff and defendant supported the guardianship and that the child had frequent contact with plaintiff and defendant

-1-

via telephone calls and Skyping, as well as visits. Intervener was granted full guardianship on November 29, 2010.

Intervener filed an annual report with the court on December 2, 2011, indicating that the parents had now returned to Michigan but that the "parents still lack necessary skills to parent child" and that "neither parent is a suitable guardian for [the child]." The report indicated that the "child loves parents and vice versa" and that visits took place "as much as possible."

Intervener filed her next annual report on November 30, 2012. She reported that plaintiff had moved out of the home in November 2012 and her whereabouts were "unknown." Intervener requested that plaintiff's future visits be supervised by her.

On April 9, 2013, plaintiff petitioned to terminate the guardianship. The trial court appointed the child a guardian ad litem (GAL), David Marsh. Marsh's September 20, 2013 report provided:

> A. The minor has essentially lived with the guardian, her grandmother, Donna Weddington, all her life.
>
> B. The mother, Kristen Falconer, had a physical abusive and substance abusive relationship with the son of Donna Weddington until sometime in November 2012 when she moved back to Hastings to be with her family in order to get her life back together.
>
> Ms. Falconer has apparently made great strides in that direction in that she is employed, substance free and has stable housing.
>
> C. The father, Chadwick Stamps, while living in the same household with his daughter, has had little to do with raising her.
>
> D. The guardian/grandmother has done a good job in raising [the child].
>
> E. Both parties blame the other for the inconsistent contact between [the child] and her mother.
>
> F. The minor child desire[s] to remain living with the guardian/grandmother.
>
> G. Child Protective Services makes no specific recommendation, stating that both parties are appropriate.
>
> This writer believes that Kristen Falconer has done a great job in getting her life together. However, she states that she has only been clean since November 2012 and did so on her own, without any profession[al] help or support.
>
> In addition, there has not been a lot of contact between Ms. Falconer and her daughter . . .the blame for which is unclear.

The undersigned recommends that this Court institute a specific plan in order to better prepare the minor for potential reunification with her mother.

The probate court set forth a court structured plan on September 23, 2013, requiring plaintiff to, among other things, submit to drug screening and participate in supervised visitation. The plan included a proposed date of March 24, 2014 for terminating the guardianship.

Intervener filed her next annual report on December 6, 2013, shortly after the structured plan was implemented. In the report, Intervener indicated that defendant lived in the same home as the child and saw her every day: "[The child] loves being with her dad! She grows more fond every day. She is completely not interested/reluctant to see her mother. She cries every time!" Intervener reported that while "mother attends 2 hour meeting/visit once a week with [the child], [the child] does NOT enjoy, is very sad + disheartened by each visit. [The child] should not be forced to have a relationship with her mother (illegible)! [The child] should continue counseling + perhaps Miss Falconer could begin attending. [The child] has been abandoned by her mother 5 times + she is reluctant and afraid." Intervener requested that the guardianship continue because "the father would like to file for full custody but does not yet have funds to hire attorney."

A couple of days later, Intervener filed a motion to have "another, more appropriate supervisor be chosen" for future supervised visits. Department of Health and Human Services (DHHS) worker Candace Stack had allowed plaintiff's grandmother, Connie Falconer, to act as supervisor during plaintiff's visits with the child. Intervener complained that Falconer had once tried to "kidnap" the child in 2009 "after a high speed chase." Included with the motion was a letter Intervener wrote to Judge Michael Jaconette on November 29, 2013, asking how defendant "can apply for custody without an attorney. He has always had physical custody. He has never abandoned her and she adores him." This, in contrast with plaintiff who has abandoned the child "5 times over the last five years" and "when she did reside with us there was little to no parenting involved." Intervener also included screen shots of email exchanges she had with Stack, even though the exchanges did not cast Intervener in a positive light. The exchanges revealed that Intervener had no intention of presenting the child for supervised visits with plaintiff if those visits included Falconer. The exchanges also show that Intervener did not agree that plaintiff should see the child twice a week.

In a December 1, 2013 report, the child's counselor, Kathleen Keeder, noted that, although the child had been initially stand-offish with plaintiff, "Kristen has followed through with all the recommendations and suggestions made to her to help with the bonding process and help [the child] to feel at ease during the sessions. Kristen has been empathic with [the child], she has validated her feelings even when they are hurtful and has been emotionally supportive. It is evidence to this clinician that [the child's] Guardian is not in support of [the child] being reunited with her mother and this is having an adverse affect [sic] on [the child]." In Keeder's opinion, plaintiff demonstrated an ability to provide a safe and stable home for the child and the two needed to be reunited.

On December 11, 2013, Candace Stack filed a report on the case. Stack, like Keeder, reported that plaintiff was doing a good job at her visits with the child, even though the child would say things like "I hate you" and "you're not my mom." Stack reported that not only did Intervener make scheduling visits difficult, but Intervener was also a distraction to the child by

waiting outside of the visitation room or in the bathroom down the hall. The child, knowing Intervener was outside the door or in the bathroom, would ask to use the bathroom several times. Intervener refused to leave the area until security guards got involved. Once Intervener was out of the area, the child began to warm up to and interact with plaintiff. Stack concluded:

> [The child's] emotional well-being is being jeopardized living with Donna Weddington. Ms. Weddington has thwarted any and all efforts of reunification between the child and her mother. It is believed that Ms. Weddington is feeding negative thoughts to [the child] about her mother, Kristen Falconer, instead of being supportive of the relationship. It is a travesty that this reunification period has not been more successful, but it is this worker's opinion this is solely due to Ms. Weddington's attitudes and actions. This worker does not anticipate that Ms. Weddington will ever support the reunification of [the child] and her mother.

In the meantime, Stack noted that plaintiff has "done an outstanding job recovering from her drug use and is ready to be a full time mother. She has awesome family support in the Hastings area. There is no reason to continue this guardianship, the recommendation is to terminate."

> The child's GAL made a similar recommendation in his December 18, 2013 report:

> Ms. Weddington has frequently procrastinated and attempted to circumvent the arrangements made by Child Protective Services to move forward with the plan. She claims that these arrangements are detrimental to and against the best interest of [the child]. Ms. Weddington believes that Kristin [sic] Falconer doesn't want [the child]; she is jealous of Chad Stamps and is doing this to hurt him.

> It is this writer's opinion that Donna Weddington is so desperately afraid of losing custody of [the child] that she grasps at any straw in the attempt to prevent termination of the guardianship. It is further my belief that Donna Weddington continues to attempt to undermine this process by coaching the minor.

> RECOMMENDATION:

> The undersigned recommends that this case continue on track to termination of the minor guardianship as the mother has done all that is asked and required of her.

> I further recommend that this Court emphasize the need for Donna Weddington to totally cooperate with the Court structured plan especially with the parenting time arranged by Department of Human Services under the penalty of contempt and/or removal of the minor from Ms. Weddington.

A hearing was held on December 18, 2013. That same day, the probate court ordered that, in light of plaintiff's substantial compliance with the court-structured plan, the termination of the guardianship "should be accelerated from the previously scheduled termination date of 3-24-14 to an earlier date" and that "the best interests of the minor would be served by continuing the guardianship until 1-16-14 pending completion of a modified court-structured plan which

-4-

will allow for unsupervised parenting time as specified in this plan and will allow for counselor(s)/therapist(s) of the minor to address with her the scheduled 1/16/14 permanent reunification of the minor with her mother." The guardianship was terminated in a January 16, 2014 order.

## B. COMPETING COMPLAINTS FOR TEMPORARY CUSTODY

Plaintiff filed her complaint for custody in the trial court on December 23, 2013, before the order terminating the guardianship was entered. Plaintiff preemptively sought temporary custody to avoid interference by defendant or Intervener with the guardianship's imminent termination. The complaint sought sole physical and legal custody, suspension of defendant's parenting time, and exclusion of Intervener from any visits the child would have with defendant.

Defendant filed a motion for temporary custody on January 8, 2014. He was concerned that termination of the guardianship would result in the child being placed with plaintiff, who had abandoned the child and whom defendant contended was unfit.

At a January 13, 2014 motion hearing, the trial court indicated that it had discovered outstanding warrants for defendant's arrest for malicious destruction of property and home invasion. Defendant was immediately placed into police custody. Defendant was also ordered to submit to a drug test and tested positive for marijuana. Counsel for defendant nevertheless begged the trial court not to uproot the child's life by removing her from Intervener's care, especially where "we have a mother who simply left the home where her daughter lived went for many months without having any real meaningful contact with her daughter . . .She left the home. She made no efforts for a considerable period of time to have regular contact with the daughter." Plaintiff's attorney explained that plaintiff was forced to leave the child in November 2012 because of the abusive situation with defendant. Plaintiff sought substance abuse counseling and had been very diligent in trying to gain custody of the child. In fact, the only reason the probate court did not order same-day termination of the guardianship was to allow intensive services to the child to prepare her for the transition. Counsel believed that Intervener brought defendant to court as a proxy, pointing to the fact that defendant had played no part in the probate court proceedings. Citing its authority to place a child with a third party under the Child Custody Act (CCA), MCL 722.21 *et seq*, the trial court concluded that it would not uproot the child and left the child in Intervener's care.

Intervener filed her motion for intervention and for custody on January 15, 2014, citing MCL 722.26b(1) (action for custody by a guardian). The trial court granted the motion at a February 3, 2014 hearing.

Plaintiff moved to modify temporary custody on January 21, 2014, citing defendant's continuous abusive and criminal behavior and Intervener's failure to protect the child by essentially covering up defendant's illegal and violent behavior. The trial court denied the motion but modified parenting time to allow plaintiff mid-week contact and extended weekend visits to Monday mornings. The trial court also appointed the child a GAL. It refused to appoint Marsh (the child's GAL from the probate proceeding) because of Marsh's ex parte communication with the judge in which Marsh expressed displeasure with how the case was going. Michael Clore was named GAL.

## C. THE CUSTODY HEARING

Defendant represented himself at the custody hearing. Importantly, at no time did defendant seek custody of the child; the hearing was essentially between plaintiff and Intervener. At the time of the hearing, there were a number of allegations regarding defendant's assaultive behavior. The focus was on whether the child was exposed to domestic violence in Intervener's home. Intervener and defendant denied that there was any domestic violence. In contrast, plaintiff and her witnesses reported that defendant had a history of abusing, not only his girlfriends, but Intervener.

Children's Protective Services (CPS) investigator Megan Wilder testified that she received an allegation of substance abuse and physical neglect in Intervener's home on January 13, 2014, which coincided with the hearing in which defendant was arrested on outstanding warrants. Wilder tried visiting the home four times and left a business card. She received a voice mail on January 21 from Intervener, telling Wilder she was not welcome in the home and giving Wilder the name of her attorney. Wilder finally met with Intervener in February, along with Wilder's supervisor, Chadd Hannah and ongoing worker Christian Giggy. Defendant was not present for the meeting. Wilder noted that Intervener's "story changed several times" during the meeting. When confronted with two separate police reports regarding defendant's criminality, Intervener either denied the incidents occurred or downplayed them. One incident involved the malicious destruction of property and the other involved a home invasion. CPS was concerned because the child was present for both incidents.[1]

Wilder reviewed the police reports and spoke with defendant's ex-girlfriend Alaura Haueter about "other things" in the home that concerned Wilder. Wilder ultimately concluded that Intervener failed to protect the child. A case was opened as a "category two." Both Intervener and defendant were placed on Central Registry and the matter was transferred to an ongoing worker for services, including psychological evaluations for Intervener, defendant, and the child. The child was not removed from Intervener's care because Wilder did not "see any significant risk of harm that was an immediate threat to the child." Wilder met with the child at school and the child "seemed a little coached" and made statements "I don't usually hear a five or six-year-old say to me."

DHHS worker Christian Giggy testified that he received the case after Wilder substantiated the allegations. Defendant was noncompliant and did not complete his psychological evaluation; Intervener and the child completed theirs. The child was already receiving counseling with Sheri Pancost, so additional counseling was not ordered. Giggy was

---

[1] The malicious destruction of property incident occurred on February 9, 2013. Defendant was involved in a road rage incident and ripped the rear windshield wiper off of the back of another vehicle (road rage incident). The second incident occurred on June 18, 2013, when defendant went to a "friend's" home armed with a knife to confront the friend about taking marijuana plants (home invasion incident). Intervener admitted that the child was present for the home invasion incident but gave conflicting statements about whether the child was present for the road rage incident.

led to believe that defendant was out of Intervener's home. Giggy believed the child's home with Intervener was safe, but Intervener was always rescheduling appointments. So while Intervener was technically compliant, Giggy testified that "[t]he amount of time and energy that I've put into trying to make arrangements to see her, to see the children,[2] verify their well-being, has been extensive, in my opinion." On one unannounced visit, Giggy knocked on the door and was confident that individuals were there but not responding to his knocks. Intervener told Giggy that the child was unavailable for a psychological evaluation during spring break, but Giggy contacted plaintiff who was able to make sure the evaluation was completed. Afterwards, Intervener left Giggy a voicemail and "talked about how we failed to forget that she has custody and she didn't authorize the psychological evaluation to occur and that we would be hearing from her attorney."

Giggy observed plaintiff with the child and found her to be "very attentive." He had no concerns about plaintiff's parenting ability. Giggy noted that when the child was with Intervener, she was more guarded in talking to Giggy, looking to Intervener for reassurance. Giggy opined that "there may be some type of coaching." In contrast, the child opened up more when with plaintiff. Giggy testified that the case would likely close if the child was returned to plaintiff, but would remain open if the child remained with Intervener.

CPS outreach counselor Kathleen Keeder testified that her involvement in the case dated back to the probate matter. She received a referral in the probate case to work with plaintiff, Intervener, and the child to ease the child's transition from living with Intervener to living with plaintiff. Keeder observed numerous visits between plaintiff and the child. At the first visit, the child did not interact with plaintiff, saying things like "you're not my mom, I want to go home." Plaintiff tried to engage the child, showing an enormous amount of patience and empathy, but the child would not talk to or even look at plaintiff. Keeder categorized plaintiff's level of skill at these visits as "good" from the very start. They met weekly and, as the sessions continued, the child warmed up to plaintiff, becoming affectionate and engaging in activities. "[I]t seemed like a normal mother/child relationship the way they were playing together."

Keeder observed that the child would use the bathroom frequently during these visits and believed it was because Intervener was just outside of the room where plaintiff was visiting with the child. The workers then asked Intervener to sit downstairs and observed that the child did not leave the room as frequently once she realized Intervener was not there. Intervener also canceled visits the child was to have with plaintiff on at least two occasions. In Keeder's estimation, Intervener was not interested in outreach services and refused visits Keeder planned to make to Intervener's home; Intervener was "not cooperative at all." Keeder wanted Intervener to help the child prepare to the transition from one home to the other, but Intervener refused. In contrast, plaintiff welcomed Keeder into the home that plaintiff shared with her grandparents. The downstairs was a completely furnished apartment. The child would have her own room and the living arrangement was appropriate.

---

[2] The plural use of "children" includes Intervener's teenaged daughter, Abbie.

Keeder previously recommended terminating the guardianship because plaintiff was "at a place where she can take care of [the child], and [the child] does appear to have a bond with her mom and they get along great together, and so I felt that it was time for [the child] to go back home to her mom." Keeder opined that plaintiff and the child "have a very good bond. I think Kristen loves her child very much and I think [the child] loves her very much." Because Intervener would not cooperate, Keeder never had a chance to see Intervener interact with the child.

Ongoing CPS worker Candace Stack testified that she became involved in October 2013 after the court-structured plan was put into place in the probate proceeding. Plaintiff had five drug screens between October 2013 and December 2013, all negative. Plaintiff had already started counseling by her own initiative and Stack was able to obtain their reports. Stack supervised visits with the child and plaintiff. At first, visits did not go well. The child was "standoffish" with plaintiff and would sit in the corner, saying, "You're not my mom, I hate you." Several of the visits were like that. Intervener had placed herself right outside of the visiting room instead of sitting where other people were waiting. She would even sit on the floor. The child would ask to use the bathroom four or five times and Intervener would be right there. Intervener even once waited in the bathroom. Stack asked Intervener if she could go run errands or wait downstairs. Intervener said she would go run errands if someone gave her a gas card. Stack asked Intervener two more times to please go down to the first floor. Eventually a security guard asked her to and she complied. But Intervener returned to the floor and had to be escorted by security. Intervener's teenaged daughter, Abbie Weddington, was also present during the visits.

Stack noticed that visits started to go well after Intervener was removed from the situation and plaintiff "was doing a fantastic job" interacting with the child. "I could see that she was a very loving, caring mother." Parenting time was expanded to visits at plaintiff's house on Saturdays. Intervener, who believed that expanded visitation went against court-ordered visits, was not cooperative in bringing the child for the visits. Intervener also objected to plaintiff's grandparents, Connie and Donald Falconer, acting as designees for supervised visits. Intervener told Stack that the child was "scared to death of Connie" because there was a high speed chase that occurred when the child was an infant. Stack noted that the child was born in March 2008 and the alleged incident occurred in January 2009 when the child was less than a year old. The Falconers had no criminal record and were not on Central Registry.

Plaintiff was fully compliant with her structured plan and Stack previously recommended that the guardianship end. Because Intervener would not cooperate, Stack never had the chance to visit Intervener's home or report who lived there. Stack reported Intervener's noncompliance to the probate court. Stack also observed Intervener with a black eye at a custody hearing.

Sheri Pancost testified that she was the child's therapist. Intervener had retained Pancost on July 3, 2013, prior to any court intervention, to help with the child's adjustment to seeing plaintiff. Pancost noted that the child looked to Intervener for reassurance and asked that Intervener be part of the first couple of sessions. The child reported that she wanted to live with Intervener and that she was unsure about visiting plaintiff. She was initially angry at plaintiff. Pancost continued to see the child weekly after the court became involved. On January 9, 2014, Pancost began joint sessions with the child and plaintiff at CPS's suggestion. By that time, the

child had become more comfortable talking about plaintiff. Pancost observed that plaintiff interacted with the child "just the way you would expect most parents interact. She engages with her, talks to her." Pancost had no concerns about plaintiff's parenting ability. As the visits progressed, the child was increasingly able to show plaintiff love and affection. The child reported that she had fun with her cousins on plaintiff's side of the family, but was still uncomfortable with her great grandparents. She thought they were a little "creepy" because they were so much older. The child reported that she missed her half-sister, whom we will refer to as "A".[3] The child also expressed fear of defendant on one particular incident and did not discuss him nearly as much as the other people in her life. Pancost believed that the incident that caused the child to fear defendant was the reason that Intervener, Abbie and the child had to stay in a hotel just before they moved into a new house. Pancost had the impression that even when they were living together, defendant's interaction with the child was limited. The child reported that defendant would yell and spend a lot of time in his room.

Pancost opined that the child was capable of making a healthy adjustment to living with plaintiff. Pancost believed that the child would have adjustment problems if someone was saying negative things about plaintiff. Pancost believed that the child was not nice to plaintiff initially because the child was afraid she would have to move. The child was afraid that plaintiff would "leave her again," meaning leave her with people she was not comfortable with. Pancost indicated that this fear stemmed mostly from lack of interaction with the great grandparents, but the child also referred to a "car chase." Pancost noted that the child "has a strong bond with [Intervener]. She feels really close to her and comfortable with her" and it would be traumatic for the child to lose all contact with Intervener, who was the stable force in her life. "If she had visitations or something like that still, it might lessen that impact."

Clinical psychologist Dr. Randall Haugen testified that he evaluated the child on April 10 and 11, 2014. The child expressed ideas of being abandoned or lost and had a "vague sense of mother being unsafe." Haugen testified that the child's "presentation of the information was pretty adult-like." She repeatedly used the word "abandonment" and said it was "bad", but could not tell Haugen what the word meant. Haugen noted that using the word abandonment, as the child did almost 40 times, was inconsistent with a child her age. Haugen believed the child was repeating some adult conversation. In terms of being conditioned, Haugen noted that the child's interpretation of events "seemed to be what she felt that grandma perceived also." Haugen warned that if the negative feelings continued, it would impact the child's function: "Children in these situations over a long period of time are really prone to develop emotionally behavioral difficulties" and negative statements create "a lot of anxiety and apprehensiveness just about her basic sense of stability, who she is, where she's going to be in the future."

Haugen testified that, without regard to intent, the child had been groomed or conditioned either directly or indirectly by Intervener. The child perceived Intervener as "her psychological parent at this time," who met her needs. She had a more conflicted relationship with her mother

---

[3] As will be discussed in further detail below, A was defendant's child with his girlfriend, Alaura Haueter.

because she perceived plaintiff as having abandoned her and as someone who "has a lot of problems and is really bad." The child did not believe that plaintiff's love for her was true love; she believed that the love she received at home was "real" love. The child said "mommy is pretending." Haugen believed that Intervener's statements to the child that plaintiff was the biological mom but not the real mom were "undermining."

At the time of trial, plaintiff was 24 years old. Plaintiff testified that she was 17 and defendant was 15 when they began dating. Plaintiff was not getting along well with her step-mother and Intervener indicated that she would "love" for plaintiff to move in with them. At the time, plaintiff and defendant had been dating for approximately two months. Plaintiff described herself during that time as a "dumb, love-struck teenager." She managed to graduate from high school in 2007, but defendant dropped out.

Plaintiff became pregnant with the child in July 2007. Plaintiff, defendant, and Intervener were living in Florida at the time. They returned to Michigan in August 2007. Plaintiff and Intervener lived in Grand Rapids with one of Intervener's friends because they had no money and needed a place to stay while Intervener found a home. Abbie lived in Battle Creek with a friend, and defendant lived in Hastings. Eventually Intervener found housing in Battle Creek and the group came back together. From December 2006 until the time of trial, Intervener had eight different residences. Plaintiff testified that, aside from the move from Florida back to Michigan, each move was the result of the failure to pay rent.

The child was born March 23, 2008.[4] Plaintiff stayed home with the child for three weeks but then went back to work as a waitress because the family needed money. Plaintiff testified that, at that time, Intervener helped take care of the child, but the primary childcare responsibility went to plaintiff.

Plaintiff testified that defendant moved down to Arizona in March 2010 to attend a mechanic's school. Plaintiff went down a month later to visit. Intervener and defendant decided that plaintiff should stay in Arizona in order to help defendant recuperate from shoulder surgery and to make sure that he did not drop out of school. Although she wanted to be with the child in Michigan, plaintiff wanted to make sure defendant graduated from the program so that he could begin contributing to the family's finances. The couple stayed in Arizona for approximately 16 months. They saw the child on visits and via Skype. During this time, plaintiff believed she had a "good" relationship with Intervener. She did not feel the need to delegate parental authority because she trusted Intervener. Plaintiff acknowledged that in the time she was in Arizona, "things had kind of turned a little bit" and Intervener had primary care of the child. Defendant finished his program in July 2011 and the couple returned to Michigan that summer. Plaintiff "had no idea" about the guardianship until she left the home in November 2012.

Plaintiff acknowledged that she began abusing drugs while living in Arizona. She began with the prescription drug Oxycodone. When the couple moved back to Michigan, defendant

---

[4] Plaintiff explained that the child was given the last name of one of defendant's mentors because he did not want the child to have his biological father's last name.

started using heroin in December 2011 and plaintiff started using it in April 2012. Plaintiff began working as a dancer and admitted that she "wasn't parenting the way that I should have . . . I wasn't in a good state to be a parent." She and defendant slept a lot and spent a lot of time in their room. Plaintiff deferred to Intervener when it came to the child's care. Plaintiff and defendant would fight when they ran out of money for drugs, which was nearly weekly. Intervener would take the child into another room and tell her that defendant "didn't mean to act like that." A number of times Intervener had to summon the police, but once they got there, Intervener would tell them that everything was fine, so plaintiff followed suit. In 2009, plaintiff attempted suicide one time by taking a number of aspirin: "Because Chadd had gotten into an argument with me and told me that I made everybody miserable, nobody wanted me around, [the child] didn't need me, [the child] didn't want me, and that I was a horrible person and that everybody hated me and . . .being treated like that on a daily basis gets to you."

Plaintiff testified that there was physical violence in the home, including pushing, kicking and hair-pulling. On one occasion defendant was at the top of the stairs and threw an old television at plaintiff, who was at the bottom of the stairs. There was physical violence almost daily; Intervener was present for it and was also a victim. Plaintiff explained that the "littlest things" would upset defendant and "you never knew what was going to make him mad." Plaintiff had been pushed down the stairs and had her face stomped on. When plaintiff talked to Intervener about defendant's behavior, Intervener's response most of the time was to tell plaintiff that she needed to learn to "not make him so mad and it wouldn't happen."[5]

Plaintiff explained the "kidnapping" incident. Plaintiff tried to leave defendant in January 2009 and stayed with her grandparents for about a week. Plaintiff obtained an affidavit of parentage, thinking that she could take the child out of the Intervener's home. Plaintiff and her grandmother, Connie Falconer, went to Intervener's home, but the child was not there. Plaintiff and her grandmother waited until Intervener and defendant left the home and followed them. Plaintiff wanted the child to have a family, so she went back to Intervener's home shortly thereafter.

Plaintiff left Intervener's home once and for all in November 2012. Defendant confronted one of plaintiff's male friends by slashing one of his tires and running over his leg with a car. Plaintiff went to a friend's house and went through drug withdrawal. When plaintiff's new boyfriend became abusive in December 2012, plaintiff went to live with her grandparents. It was at that point that plaintiff decided to focus her efforts on finding stability. Plaintiff had recently become a certified nursing assistant at a long-term care facility. Plaintiff would ask Intervener to see the child, but Intervener made it difficult. Intervener did not allow plaintiff to see the child again until February 2013. Plaintiff applied for termination of the guardianship in March 2013. Intervener contacted plaintiff and told her that if she dropped the petition to terminate the guardianship, then plaintiff would be able to see the child at certain times, including unsupervised visits. Plaintiff was tempted to drop the petition, but did not.

---

[5] Plaintiff's sisters also testified as to the abuse and plaintiff's alienation from her family.

Plaintiff acknowledged that the child had some negative emotions at first and initially refused to refer to plaintiff as "mom." Plaintiff also acknowledged that the child shared a very close bond with both Intervener and Abbie, whom the child referred to as her sister. Plaintiff was not opposed to the child seeing Intervener: "I don't think that she shouldn't be allowed any contact, but as long as Donna can show that she is not going to be harmful to [the child's] emotional wellbeing . . .and if she will be in support – actual support of [the child] and my relationship. . . .I would like to see from Donna that she's trying and that she's not – not trying to turn [the child] against me in any way, shape, or form."

Plaintiff testified that the child had a medical appointment that she wanted to attend. In the waiting room, Intervener turned to plaintiff and said that she did not need to come back to the room and was not wanted there. Intervener told plaintiff to wait in the waiting room. Plaintiff also testified to an incident in which Intervener gave her misinformation about a party that the child wanted to attend. Intervener also interfered with plaintiff's attempts to meet with the child's teacher, again telling plaintiff that she was not allowed in the school and was not wanted there.

Although plaintiff initially vehemently denied having recent contact with defendant, she later admitted to seeing him on a number of occasions since February 2013. Plaintiff allowed the child to talk to defendant on the phone and allowed her to see defendant after he hurt his head. Plaintiff admitted to staying overnight at defendant's on occasion. They were having sexual relations throughout the course of the case. But plaintiff still denied being in a relationship with defendant: "I was stupid and I am very ashamed for letting him get into my head. He absolutely made me believe that I needed him on my side and I was – I needed to do anything and everything possible to get [the child] out of a bad situation."

Plaintiff called Alaura Haueter as a witness. Haueter testified that defendant was her ex-boyfriend and father of her child, A, born December 31, 2013. Haueter began her relationship with defendant in October 2012 and moved in with defendant, Intervener and Abbie in November or December 2012, just one month after plaintiff left the home. Haueter testified that there was domestic violence perpetrated by defendant against Haueter and Intervener. The abuse would take place as regularly as every other week and included "punching, kicking, biting, pulling hair, anything he possibly could." Within two weeks of A coming home from the hospital, defendant gave Intervener a black eye. Intervener minimized defendant's behavior and would ask Haueter "what did you do this time?" The child was also present for some of the outbursts. Intervener would tell the child that defendant "was sick and that it was going to be okay and that he was going to fix himself." The child would cry and run and hide. Haueter testified that defendant kept Haueter from her family: "I never had a phone, I never had a way out. He had sold my car. He had never let me talk to my family." Haueter tried leaving defendant on two separate occasions by having her sister come get her. Defendant convinced her to come back by promising to get counseling.

Haueter took advantage of the fact that the rest of the household was at court on January 13, 2014 to make her escape. Haueter called her sister and father to come and get her. Intervener came home while she was packing and told Haueter "you're not going anywhere" and "why are you doing this to our family?" Intervener would not move out of Haueter's way, so Haueter ripped the shades off of the window and banged on the window to get her sister's and

father's attention. Police officers arrived on the scene. Intervener proclaimed that she had done nothing wrong and that Haueter had not been held against her will.

Haueter was present during the home invasion incident when defendant went to confront the man whom he believed stole from him. Abbie believed she knew who had taken the marijuana and lamps. Intervener, defendant, Haueter, and the child drove to where Abbie was. It was Intervener's idea that the child accompany the family to confront this individual. Abbie was trying to convince the individual to return her brother's items when defendant became upset and chased the individual into the house. Defendant knocked on the door and knocked on a window so hard that his hand went through it. The child was sitting on Haueter's lap inside the family's van. The child was upset because she thought defendant was going to die since he cut his arm. An ambulance was called and police questioned defendant at the hospital.

Haueter testified that the child was present when Intervener and defendant discussed plaintiff. They described plaintiff to the child as "someone that she never really knew." They said that plaintiff "was a druggie and that she would never change because she has mental issues and that she doesn't know [the child] and she doesn't have the right to know [the child]."

Fifteen-year old Abbie Weddington described the child as her little sister and favorite person in the world. Abbie did not observe any domestic violence in Intervener's home. If there was yelling, she, Intervener, and the child would leave. Abbie observed verbal fights between defendant and Haueter, but not as frequently as when defendant and plaintiff used to fight. Abbie saw defendant push past Haueter once when Haueter refused to leave him alone. Abbie never saw Intervener or defendant try and keep plaintiff from leaving the home.

The day Haueter left, Abbie was home sick from school with the flu. Abbie called her mom, who arrived as Haueter was packing her things. Abbie denied that Intervener did anything to keep Haueter from leaving, though she acknowledged that Haueter pulled the shade off of the window. Abbie denied that the police were involved. Abbie and Intervener now lived in a different house from defendant. Abbie denied that the move was prompted by anything other than wanting more space and because defendant was older. She denied that the child was afraid of defendant. Abbie never heard any negative comments about plaintiff.

In the middle of the proceedings, plaintiff filed a motion to modify temporary custody after it was revealed that the child placed calls to plaintiff and others in an attempt to recant what she previously told her therapist – that she had witnessed defendant's domestic abuse. Abbie was there when the child called plaintiff after being confronted about statements she made to Pancost. Intervener explained that defendant had been at the house and returned a few minutes later after speaking with plaintiff on the phone. Apparently plaintiff let defendant know that the child had revealed that there was domestic abuse in the home to her therapist. Defendant returned to the home to see if it was true. Defendant was upset when he questioned the child about it. Intervener asked Abbie to take the child to her room. Intervener told defendant that the child did not reveal any abuse. Instead, plaintiff "was continuing to push his buttons, and that he needed to calm down and to think about the situation, and that was about it, and then he left." Intervener did not realize that the child had called plaintiff. The trial court later ordered that defendant have no contact with the child pending resolution of the case. It declined plaintiff's motion to change temporary custody, even as the GAL noted: "This child is being told things,

-13-

and this – this case is being discussed with her. She is being put in the middle of this. She is being pitted against her mother by calling her. This is harming this child."

On June 6, 2014, the matter was adjourned because the child's half-sister, A, had become ill and was in the hospital. The trial court ordered that plaintiff's summer parenting time be accelerated and ordered that plaintiff could pick up the child from school at the end of the day to begin parenting time or, alternatively, if the child was with her sibling at the hospital, plaintiff was to begin summer parenting time at noon the next day. Intervener picked up the child from school that day. Staff informed her that plaintiff had called and said she was bringing paperwork that would allow her to take the child home. Intervener left before plaintiff arrived, explaining "I didn't have time to worry about it" in light of the fact that she was on her way to the hospital in Grand Rapids to see A. Because the child was not allowed to have contact with defendant, Intervener dropped the child off at her friend's home. Plaintiff went to the hospital, looking for the child but Intervener told plaintiff that the child was not with her and that she had no way of contacting the child. Intervener did not know the address for her friend, whom she had known for 15 years. Intervener did not provide the phone number because "I wasn't asked for it." "She [plaintiff] tried to hand me a piece of paper when she first got there, but I was already walking out." Intervener admitted she had spoken with her own attorney an hour before seeing plaintiff at the hospital.

Intervener testified that the child calls her "Mimi" and never referred to her as "grandma." Intervener denied doing anything to negatively impact the relationship between plaintiff and the child – "The mother has done that all by herself."

Intervener testified to the number of times plaintiff was absent from the child's life, including when she was in the hospital for a week when the child was six months old after attempting suicide. Plaintiff left for Arizona on two separate occasions. Intervener had flown plaintiff and defendant home for Christmas and Intervener expected plaintiff would stay, but she decided to go back with defendant. While Intervener believed plaintiff abandoned the child, she did not believe defendant had abandoned the child.

Intervener denied ever trying to keep plaintiff or Haueter from leaving her home. In fact, she "wanted them out, both of the girls" after she "saw what they had become and what they were doing." Intervener claimed that she was actually helping Haueter carry her things out to the car, but also acknowledged that the police were there. Intervener denied that there was any domestic violence between defendant and plaintiff. "There was yelling, absolutely, throughout the course of their relationship. But I'm not sure of a relationship that doesn't have yelling. But I never saw any physical violence." Intervener denied there was ever any domestic violence against her. "In the past, when my son was 14 or 15, he got out of hand with me and I called the police and had him arrested. Has he raised his voice at me? Yes, he has. Do I put up with it? No." Intervener always makes sure Abbie and the child are away from the house when defendant is upset. Intervener attributed her black eye in January 2013 to a fall on the ice. She denied that they had to move because of an incident at Abbie's school with defendant. She explained that defendant arrived at the school upset, though she could not remember why, "that's how trivial it was." Intervener did not see any reason why the child would be afraid of defendant.

-14-

Regarding the home invasion incident, Intervener testified that defendant "went to keep someone for the police, keep someone from leaving the state until the police got there when someone broke into the shed." Intervener was the one that called the police on their way there. "It was not supposed to be any physical altercation, whatsoever." The child was in the car playing for the hour it took police to arrive on the scene. She did not witness defendant getting hurt. "There were no safety issues at all." "I didn't put [the child] in that situation. [The child] was just in the vehicle."

Intervener denied knowing anything about the road rage incident or speaking to officers. Defendant told her that someone had cut him off and that his shirt got caught on the windshield wiper.[6]

Regarding the high speed chase, Intervener testified that plaintiff "ran off" with someone and came back a week later to take the child. The child was not home. Plaintiff and Connie Falconer waited until Intervener and defendant left the house and then "began to chase us." The police ordered plaintiff to stop and leave them alone. Plaintiff moved back in with Intervener a week later.

Intervener admitted to sitting in the hallway and the bathroom, but believed prior testimony was "embellished" and that "Ms. Stack was very combative with me the entire time . . ." Intervener only lived a few minutes from where the two-hour visits were taking place, but decided to stay in order to read the Bible. She did not think she should have to spend money on gas to go back and forth.

Intervener testified that she was cooperative with CPS and it was the CPS workers who refused to return her phone calls. She denied changing any appointments. Intervener still remained uncertain as to what CPS's concerns were. Intervener did not believe the child needed protection from defendant. "I don't agree that [defendant] would ever do anything to hurt his daughter, absolutely not." She added "I never failed to protect [the child] from anybody . . .That's what I'm trying to do now."

---

[6] This was in stark contrast to Officer Tonya Wilt's testimony. Wilt testified that she responded to an incident on February 9, 2013, involving the malicious destruction of property to a vehicle. The victim provided a license plate number that led Wilt to Intervener's home. Intervener described the incident to Wilt and indicated that the other driver stopped abruptly and almost killed them. She told Wilt that the other driver spat on defendant and threatened him with a gun. The windshield wiper was torn off when defendant's jacket got caught on it. Intervener led Wilt to believe that she had no way of contacting defendant. She offered to pay the damages. Wilt testified that contact with Intervener was "odd": "just, you know, her changing of statements and stuff like that. Changing from Mr. Meyers being her son . . .to not knowing him, to him being a juvenile, when originally she had advised that he was in his twenties, I believe. I don't – didn't remember all of that, you know, offhand, but I – like I said, I just remember them being odd." Wilt had considered referring Intervener to the prosecutor for giving false information.

Intervener had followed the order that prohibited defendant from having contact with the child though she did not see the child at risk with defendant. Prior to that, the child saw defendant at least three or four times a week. Intervener believed defendant was fit to raise the child, but then clarified that there was a difference between "fit" and "ready" and defendant was not ready. This was in contrast to a letter she filed in the probate court, begging the court for help in finding out how defendant could apply for custody of the child without an attorney.

Intervener testified that plaintiff was not ready to take care of the child but did not deny there was the potential for plaintiff to provide care and custody in the future. She believed plaintiff still needed to learn "how to tell the truth, learning right from wrong, learning not how to be manipulated by other people." Intervener added that plaintiff continued to use drugs. Although Intervener was confronted that there was no proof of plaintiff's alleged continued drug use, Intervener testified "no, but I – somebody will – it will get testified to. Some person who has proof will testify to it before the day is over, sir."

Intervener denied influencing the child. "[The child] knows these proceedings are going on. As everybody has told you, she is an extremely intelligent child. Have I dwelled on or told her her mother was a bad mother, absolutely not." All that Intervener told the child was that plaintiff believed she was capable of taking care of the child and "wanted the child to come live with her." Intervener denied interfering with plaintiff's attempt to have a relationship with the child. Intervener talked to the child about the importance of having her parents in her life. The child reported that plaintiff would yell at her. "And you know, we talk about different kinds of parenting skills and – and, you that possibly – hopefully Kristen will be getting more help with her parenting skills, you know. And that as long as she felt safe, that you know, people have different types of parentings skills." Intervener testified that claims that she was attempting to sabotage the relationship was "just not the truth." "I have been there since day one for all of them – all of them; these two included, and would love nothing better than to have a peaceful relationship with all of them."

Upon questioning from the child's GAL:

*Q.* How have you fostered a relationship between Ms. Falconer and [the child]?

*A.* [The child] and I have had talks about both of her parents getting sober and that they are continuing to get the help they need.

*Q.* That's how you foster that relationship?

*A.* By talking to her? Yes, we talked about it all – yes.

*Q.* I – I

*A.* And that she's making an effort –

*Q.* You . . .

*A.* . . .to try to be a better parent.

-16-

*Q.* Okay.

*A. And maybe one day she will be.*

When confronted by the GAL's questioning regarding why Intervener would have left the child in plaintiff's care when Intervener knew she was using drugs, Intervener lashed out: "I shouldn't have left her with her mother? Yes, *that was a bad decision to let her mother try to be a mother. And I'm trying not to make that decision again and I'm hoping the Court won't.*" And during another exchange with the GAL:

*Q.* You're not going to cooperate with Ms. Falconer about anything are you?

*A.* What are you talking about?

*Q.* Her simply trying to hand you a piece of paper, you're not going to cooperate with that, are you?

*A.* How about me getting my Father's Day visit, is she going to cooperate with me?

*Q.* And – and . . .

*A.* Yes, absolutely, I would love to cooperate with Ms. Falconer if she could quit telling lies long enough to cooperate.

Intervener denied ever being evicted since caring for the child, even in the face of documents to the contrary. She testified that she never saw the documents or that the claims had been "taken care of." Intervener also downplayed an arrest for retail fraud at Meijer regarding a prescription. She denied posting to Facebook that plaintiff "who has some serious mental issues" was "trying to legally remove her from my home . . ."

Although Intervener testified that she had no objection to having her psychological evaluation released, it never was.

Defendant testified that he and plaintiff were "off and on" during the proceedings and spent nights together. They stopped speaking in June 2014. Defendant last used heroin in April with plaintiff; they had used heroin together at least six times in 2014. Defendant admitted that his relationship with plaintiff was a "cat and mouse game." He knew she had used heroin and could use that against her, while she was in a position to cause trouble with Haueter, with whom he was seeking to reconcile. Defendant's last contact with plaintiff was "when she decided that when my five-month-old was just waking up out of surgery that she needed to come up to her room to cause a commotion over a court paper."

Defendant denied any domestic violence with plaintiff: "We've had our horrible fights, just like I would assume any other couple has had. But I've never sat there and just, I mean, Mohammad Ali went crazy on her or anything like that." Defendant denied seeing Intervener coach the child.

-17-

Defendant was combative and hostile during cross. Defendant denied receiving any of the pleadings in the guardianship proceeding. He supported his mother in her resistance to terminating the guardianship and did not see a reason to be involved. Even now, he did not fight for custody because he was "not fit at this time" and wanted to allow "someone that I have seen raise [the child] her entire life continue to raise her until I am ready or Kristen is ready." He admitted to a 2009 conviction for interfering with a communication with Intervener; he claimed that the phone just died. Defendant was charged with assault and malicious destruction of property for a November 18, 2012 incident with plaintiff's friend, but that was "dropped" when no one appeared at court. Defendant constantly indicated that he did not remember things, adding "I'm sorry, I have a lot going on right now if you haven't noticed." Defendant claimed he did not remember the road rage incident. He had also "blocked out" the home invasion incident.

During closing arguments, plaintiff's attorney noted that Intervener was attempting to sabotage plaintiff's relationship with the child. Counsel added that Intervener "does not have an independent right to grandparenting time. She – . . .there's a . . .claim in which she could file to seek that, but it's not this. This is a custody case." The GAL likewise noted: "I would recommend that any parenting time with the grandmother be at the mother's discretion." The GAL further noted that the trial court should not even bother with an in camera interview of the child, in light of the grooming. The trial court nevertheless interviewed the child.

## D. THE TRIAL COURT'S DECISION

The trial court first commented on the witnesses' testimony. It found that plaintiff was not entirely forthcoming in that plaintiff initially denied seeing defendant during the proceedings. The trial court found that Intervener lied about some things, but nevertheless accepted some of Intervener's testimony as credible. Regarding defendant, the trial court noted: "listening to his testimony, or lack thereof, as well as considering his demeanor . . ., the Court totally discounts and rejects his entire testimony. . .based upon the testimony and his actions, the Court believes that in fact there just was no truthfulness in this testimony and I completely reject it." The trial court admonished plaintiff that further contact with defendant "could prove to be disastrous to you."

The trial court cited MCL 722.25(1), *Heltzel v Heltzel*, 248 Mich App 1; 638 NW2d 123 (2001), and *Hunter v Hunter*, 484 Mich 247; 771 NW2d 694 (2009), for the notion that there is a presumption that placement with the natural parent is in the child's best interest absent clear and convincing evidence otherwise. It also cited *Troxel v Granville*, 530 US 57; 120 S Ct 2054; 147 L Ed 2d 49 (2000) for the notion that a natural parent has a fundamental liberty interest in caring for her child. The trial court concluded, therefore, that Intervener had the burden of showing by clear and convincing evidence that the child should be placed with Intervener. It then proceeded to analyze the best interest factors in MCL 722.23(3) of the CCA.

The trial court found the parties on equal footing as it related to factor (a) -- the love, affection and emotional ties the child had with the parties.

As for factor (b) – the capacity and disposition of the parties to give the child love, affection, and guidance, the trial court noted that the factor favored plaintiff :

As it relates to guidance, the – Ms. Weddington had allowed her son and the Plaintiff in her home to engage in sexual relations during the time that they were minors resulting in the birth of this child. She's allowed them in both – in her house as well when they were both engaging in drug use, when she knew that, when she had in essence two minor children in the household.

Additionally, Ms. Weddington took [the child] when this – when Mr. Asher was being confronted [during the home invasion incident]. And basically, when she was questioned extensively . . . she showed a total lack of judgment as to how this could have been a dangerous situation for [the child].

As a result – and for other reasons as well – the Court will find that this factor . . .does favor the Plaintiff Mother.

As to factor (c) – the capacity and disposition of the parties to provide the child with food, clothing, medical and other remedial care – the trial court concluded that Intervener's insistence on continuing to help defendant with his rent impacted her ability to provide for the child and, as such, there was a "slight" advantage to plaintiff.

As for factor (d) – the length of time the child has lived in a stable satisfactory environment and the desirability of maintaining that environment – the trial court concluded that Intervener's many moves and the lack of safety caused it to "slightly" favor plaintiff.

As for factor (e) – the permanency as a family unit of the existing and proposed homes – the trial court found the factor equal (Tr IV, p 140).

As for factor (f) – the moral fitness of the parties – the trial court noted that "neither party has an exemplary history as it relates to this factor." It noted, however, that Intervener's behavior of pandering to or condoning defendant's behavior caused it to "slightly" favor plaintiff.

As for factor (g) – the mental and physical health of the parties – the trial court found that the factor "slightly" favored plaintiff.

As for factor (h) – the home, school, community – the trial court found that the factor favored plaintiff.

As for factor (i) – reasonable preference of the child – the trial court noted that it spoke to the child, who was clearly impacted by the proceedings. "And sometimes kids of that age come in and are just simply maybe somewhat apprehensive of the – of the Judge, or not knowing what's going to happen, but you could see that [the child] was impacted by these proceedings. But she was very pleasant, very thoughtful, and she did express a preference, and the Court is considering that preference in this particular matter."

As for factor (j) –willingness and ability to facilitate and encourage a close and continued relationship – the trial court had a lot to say:

In this particular matter, the testimony was that Ms. Weddington, when the Plaintiff went to the doctor's office, that Ms. Weddington told her to wait in the lobby. Ms. Weddington told the Plaintiff that --- when she was at school that she was not welcome at school. She told her she wouldn't be able to – she wouldn't be able to get a report card without a court order, and she – Ms. Weddington objected to having the maternal grandparents supervise any parenting time.

And the Court, likewise, believes as it relates to this issue of the car chase, there was this car chase in which she basically characterizes it a car chase, the Court doesn't – believes that they were followed, but the Court doesn't believe that it was a car chase in this particular matter. And *I think that the way that Ms. Weddington has approached a number of things in this matter have in fact impacted the way that [the child] views her mother in this particular case.*

Ms. Haueter testified that Ms. Weddington and the Defendant discussed the Plaintiff in front of [the child] and the – basically *the only reason for such conduct would be to alienate the child from the parent.*

Ms. Weddington is likewise – has a – a Facebook post that she admitted to, stating that [the child] was living with a stranger and at a stranger's home and feeling so sad. In this particular case, at some point, the child would be able to view that and see that, and that *is not conducive to establishing a parent/child relationship.*

Additionally, when Ms. Weddington was questioned by Mr. Clore back on June 18th as to whether she credited Plaintiff with any improvement, Ms. Weddington would not acknowledge that she had improved her life in any way. She wouldn't even acknowledge the improved housing, the stable job, and she wouldn't acknowledge that the Plaintiff had in fact gained control of her drug issues; notwithstanding the fact that she had had a number [of] negative drug tests.

These statements and conduct *belie any ability on behalf of Ms. Weddington to establish and continue a parent/child relationship between [the child] and the Plaintiff mother.*

So as a result, the Court will find that that factor does favor the Plaintiff mother.

As for factor (h) – domestic violence – the trial court noted that there was no evidence that plaintiff had been involved in any domestic violence whereas "there was voluminous testimony" that defendant had. The trial court concluded that the factor favored plaintiff:

I would state that Ms. Weddington did not commit any domestic violence, but she had allowed that to continue in the home, and notwithstanding the fact that she would take the child and have the child removed by her own statements and by the statements of Abbie Weddington, the testimony of Ms. Haueter was

-20-

that [the child] would cry and hide during these bouts when they occurred in the home.

And finally, as for factor (i) – any other factors the court deems relevant—the trial court noted:

> In this case, when grandmother was asked about Mr. Stamps, she acknowledged that he gets angry, he has a temper, that there's a history of bad decisions concern – and I state based on what I've seen, there's a history of bad decisions concerning her son – that she's simply blinded to his faults, his bad behavior, and his conduct.

> And the Court is also concerned about Ms. Weddington's total and complete lack of objectivity when it comes to her son in this matter . . .

Intervener having failed to meet her burden by clear and convincing evidence, the trial court ruled that plaintiff would have custody of the child.

The trial court did not end its inquiry, however. It indicated that "there are other issues the Court has to decide. Those other issues concern grandparent visitation." It addressed the factors in MCL 722.27b(6)(a)-(j).

The trial court concluded that factor (a) – the love, affection, other emotional ties existing between the grandparent and the child – favored grandparent visitation.

The trial court also concluded that factor (b) – the prior relationship between the grandparent and the child – also favored visitation.

The trial court found that factors (c) and (d) – the grandparent's moral, physical and mental fitness –favored against visitation.

The trial court considered the child's reasonable preferences under factor (e).

As for factor (f) – the effect on the child of hostility between the grandparent and the parent – the trial court noted:

> It does appear that the parties have been able to in fact get along somewhat as it relates to the exchanges, et cetera, and as a result the Court will find that in fact, hopefully, the parties can get past any animosity they have when this case is concluded, but the Court will find that that factor does favor grandparenting time.

As for factor (g) – willingness of grandparent to encourage a relationship with the parent – the trial court concluded that, for the same reasons set forth under the custody factor, the factor did not favor visitation.

As for factor (h) – allegations of abuse – the trial court did not give the factor weight even though Intervener had been substantiated for neglect.

-21-

As for whether plaintiff's decision to deny parenting time was motivated by something other than the child's best interests under factor (i), the trial court concluded that it did not feel that plaintiff acted out of ill will "but the Court does find that in fact it would adversely affect the minor child if this contact was cut off."

Finally, the trial court considered "substantially" factor (j), which was "any other factor relevant to the physical and psychological well-being of the child." The trial court noted that the child had come to depend upon Intervener. The trial court concluded that "the grandmother has met the burden by a preponderance of the evidence that in fact it would be a – the child would be placed at substantial risk of harm to the child's mental, physical, and emotional health if in fact that contact is cut off."

On August 11, 2014, the trial court entered the final order for child custody. The order granted plaintiff sole physical and legal custody of the child. Defendant's parenting time remained suspended and Intervener was granted standard parenting time for a noncustodial parent. The trial court denied plaintiff's motion for reconsideration. Plaintiff now appeals as of right.

## II. ANALYSIS

### A. STANDARD OF REVIEW

Orders concerning grandparenting time must be affirmed on appeal unless the trial court's findings of fact were against the great weight of the evidence, the court committed a palpable abuse of discretion, or the court made a clear legal error on a major issue. Issues of statutory interpretation are questions of law. Questions of law are reviewed for clear legal error. Clear legal error occurs when the trial court errs in its choice, interpretation, or application of the existing law. [*Varran ex rel Varran v Granneman*, ___ Mich App ___; ___ NW2d ___ (Docket No. 321866, decided October 13, 2015), slip op, p 12 (internal quotation marks and citations omitted).]

### B. PROCEDURAL ERROR

This case is a custody dispute between plaintiff, who is the child's biological mother, and Intervener, who is the child's paternal grandmother. Intervener had provided the child with an established custodial environment for a number of years before the custody hearing. Generally, a "court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." MCL 722.27(1)(c). However, a natural parent has a fundamental liberty interest in the care and custody of her child. *Hunter*, 484 Mich at 257. To that end, MCL 722.25(1) provides:

If a child custody dispute is between the parents, between agencies, or between third persons, the best interests of the child control. If the child custody dispute is between the parent or parents and an agency or a third person, the court shall presume that the best interests of the child are served by awarding custody to the

parent or parents, unless the contrary is established by clear and convincing evidence.

Our Supreme Court has held that the parental presumption in MCL 722.25(1) in child custody disputes controls over the conflicting presumption favoring an established custodial environment in MCL 722.27(1)(c). *Hunter,* 484 Mich 263-264; see also *Heltzel v Heltzel,* 248 Mich App 1, 26-27; 638 NW2d 123 (2001). This is because "the parental presumption has some constitutional provenance, whereas the custodial environment presumption has none." *Hunter,* 484 Mich 272. The Court explained:

> The importance of the family and the essential, basic, and precious right of parents to raise their children are well established in United States Supreme Court jurisprudence. This right is not easily relinquished. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Therefore, to satisfy constitutional due process standards, the state "must provide the parents with fundamentally fair procedures. [*Id.* at 257 (internal quotation marks and footnotes omitted).]

The Court further explained:

> *Troxel* explicitly requires courts to give some deference to a parent's decision to pursue custody because it is inherently central to the parent's control over his or her child.
>
> By contrast, unlike the parental presumption in MCL 722.25(1), no constitutional protections for third persons underlie the established custodial environment presumption in MCL 722.27(1)(c). This Court has held that no constitutional or statutory basis exists for third parties to have standing to seek child custody solely because they have an established custodial relationship with the child. [*Id.* at 263.]

Absent a statutory requirement to the contrary, the parental presumption does not even require a threshold determination of parental fitness. *Id.* at 268. That is because "a natural parent's fitness is an intrinsic component of a trial court's evaluation of the best interest factors in MCL 722.23." *Id.* at 270. The best interest factors that require a trial court to consider a parent's "moral fitness" and "mental and physical health" "reflect the legislative determination that concerns about parental fitness are of paramount importance in custody determinations." *Id.* at 270-271. Therefore, in a custody dispute between a natural parent and a third party, it is presumed that the child's best interests are served by being placed with the natural parent unless the third party can demonstrate otherwise by clear and convincing evidence. A custody proceeding necessarily involves an inquiry as to the fitness of the competing parties, utilizing the best interests standards set forth in MCL 722.23.

An action for grandparenting time, unlike custody, is simply a different cause of action altogether. Here, in granting plaintiff full physical and legal custody, the trial court methodically considered the child's best interests in MCL 722.23 and concluded that Intervener failed to meet

-23-

her burden of showing by clear and convincing evidence that the child's best interests would have been served by placing the child in Intervener's care. Necessarily included in that decision was the trial court's tacit finding that plaintiff was a "fit" parent. Whereas a custody case involves an inquiry as to parental fitness, a proceeding under the grandparent visitation statute *presumes* parental fitness. Absent a challenge to the trial court's custody decision, it is presumed that plaintiff is a fit parent and "there is a presumption that fit parents act in the best interests of their children." *Troxel*, 530 US at 68.

The United States Supreme Court has declared that "the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." *Id.* at 70. *Troxel* struck as unconstitutional a Washington statute that permitted *any* person to at *any* time to seek visits with a child if such visits were in the child's best interests because a fit parent's decision was accorded no deference. *Id.* at 67. Similarly, in *DeRose v DeRose*, 469 Mich 320, 333-334; 666 NW2d 636 (2003), our Michigan Supreme Court struck as infirm the prior version of MCL 722.27b because "[t]here is no indication that the statute requires deference of any sort be paid by a trial court to the decisions fit parents make for their children" and "fails to require that a trial court accord deference to the decisions of fit parents regarding grandparent visitation."

Our current grandparenting time statute now affords such deference. A child's grandparent may seek a grandparenting time order where, as here, "[i]n the year preceding the commencement of an action under subsection (3) for grandparenting time, the grandparent provided an established custodial environment for the child as described in section 7, whether or not the grandparent had custody under a court order." MCL 722.27b(1)(f) (footnote omitted). The grandparenting statute also sets forth the procedure for bringing the issue of grandparenting time before the court. Where, as here, the "circuit court has continuing jurisdiction over the child" because of the custody proceeding, "the child's grandparent *shall* seek a grandparenting time order by filing a motion with the circuit court in the county where the court has continuing jurisdiction." MCL 722.27b(3)(a) (emphasis added). Additionally, the motion "shall be accompanied by an affidavit setting forth facts supporting the requested order" which, in turn, allows the party having legal custody to file an opposing affidavit. "A hearing shall be held by the court on its own motion or if a party requests a hearing. At the hearing, parties submitting affidavits shall be allowed an opportunity to be heard." MCL 722.27b(4)(a).

However, because "[a] parent has a fundamental right, one that is protected by the Due Process Clause of the Fourteenth Amendment, to make decisions concerning the care, custody, and control of his or her child . . .[i]t cannot be disputed that a grandparenting time order interferes with a parent's fundamental right to make decisions concerning the care, custody, and control of a child." *Varran*, slip op, p 6 (internal citations omitted). Therefore, our legislature has provided that:

> (b) In order to give deference to the decisions of fit parents, it is presumed in a proceeding under this subsection that a fit parent's decision to deny grandparenting time does not create a substantial risk of harm to the child's mental, physical, or emotional health. To rebut the presumption created in this

subdivision, a grandparent filing a complaint or motion under this section must prove by a preponderance of the evidence that the parent's decision to deny grandparenting time creates a substantial risk of harm to the child's mental, physical, or emotional health. If the grandparent does not overcome the presumption, the court shall dismiss the complaint or deny the motion. [MCL 722.27b(4)(b).]

Our Court has recently upheld a constitutional challenge to this statute, holding that the statute "does not allow a trial court to grant grandparenting time simply because it disagrees with the parent's decision" and "thus abides by the *Troxel* deference requirement." *Varran*, slip op, p 9. The Court further held that, because fit parents are provided with a presumption of fitness, "the requirement that grandparents, in order to rebut the presumption given to a fit parent's decision, prove by a preponderance of the evidence that the parent's decision to deny grandparenting time creates a substantial risk of harm to the child is sufficient to protect the fundamental rights of parents." *Id.* at 11.

Here, the trial court conflated these two separate and distinct actions. It first concluded that plaintiff was entitled to custody of the child based on Intervener's failure to show by clear and convincing evidence that the child's best interests were not served by placing the child with plaintiff. However, the trial court sua sponte continued that "there are other issues the Court has to decide. Those other issues concern grandparent visitation." It then plowed ahead and addressed the factors in MCL 722.27b(6), which provides:

(6) *If the court finds that a grandparent has met the standard for rebutting the presumption described in subsection (4)*, the court shall consider whether it is in the best interests of the child to enter an order for grandparenting time. If the court finds by a preponderance of the evidence that it is in the best interests of the child to enter a grandparenting time order, the court shall enter an order providing for reasonable grandparenting time of the child by the grandparent by general or specific terms and conditions. In determining the best interests of the child under this subsection, the court shall consider all of the following:

(a) The love, affection, and other emotional ties existing between the grandparent and the child.

(b) The length and quality of the prior relationship between the child and the grandparent, the role performed by the grandparent, and the existing emotional ties of the child to the grandparent.

(c) The grandparent's moral fitness.

(d) The grandparent's mental and physical health.

(e) The child's reasonable preference, if the court considers the child to be of sufficient age to express a preference.

(f) The effect on the child of hostility between the grandparent and the parent of the child.

(g) The willingness of the grandparent, except in the case of abuse or neglect, to encourage a close relationship between the child and the parent or parents of the child.

(h) Any history of physical, emotional, or sexual abuse or neglect of any child by the grandparent.

(i) Whether the parent's decision to deny, or lack of an offer of, grandparenting time is related to the child's well-being or is for some other unrelated reason.

(j) Any other factor relevant to the physical and psychological well-being of the child. [Emphasis added.]

While the trial court carefully considered the best interest factors under the grandparenting visitation statute, MCL 722.27b(6), separately from its previous best interests determination on custody, MCL 722.23, it nevertheless committed error by even considering the issue of grandparent visitation. Importantly, plaintiff received custody of the child just moments before the trial court's decision on grandparenting time and, therefore, plaintiff had not "denied" Intervener grandparenting time. The trial court, in rendering an opinion on grandparent visitation absent a request to do so, effectively jumped the gun and presumed that plaintiff would unreasonably deny Intervener grandparenting time. But plaintiff testified that she was amenable to visitation as long as Intervener did nothing to sabotage plaintiff's relationship with the child.

Additionally, "[b]ecause a grandparenting time order overrides a parent's legal decision to deny grandparenting time, a grandparenting time order interferes with a parent's fundamental right to make decisions concerning the care, custody, and control of his or her child." *Varran*, slip op, p 6. As previously stated, the primary issue in a custody proceeding is markedly different from the primary issue in a grandparent visitation proceeding. In the former, the trial court must determine the relative fitness of the parties and the child's best interest. In the latter, the parent's fitness is presumed and it is incumbent on the grandparent to show by a preponderance of the evidence that the parent's decision to deny grandparenting time creates a substantial risk of harm to the child's mental, physical, or emotional health. The trial court, in granting Intervener grandparenting time absent a request to do so, deprived plaintiff of the opportunity to argue that Intervener failed to rebut the presumption. In fact, the trial court failed to indicate that it was even taking the presumption into consideration. Plaintiff was also denied the opportunity to address the best interest factors set forth in the statute. "[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel*, 530 US at 72-73.

Also of critical importance was the fact that the custody proceeding was not conducted in such a way as to elicit whether the child would suffer mental, physical, or emotional harm if grandparent visitation was denied. Instead, the focus was on the child's physical placement. True, there was testimony that the child, who had lived with Intervener her entire life, was strongly bonded to Intervener and that a total denial of contact with Intervener would be potentially harmful. But the evidence also clearly demonstrated that the child's transition from Intervener's home to plaintiff's home was made unnecessarily difficult as a result of Intervener's

behavior. Thus, even assuming that Intervener could successfully rebut the presumption, the record would need to be developed to determine just exactly how grandparent visitation (or lack thereof) would impact the child. By the same token, assuming that continued visits would be permissible after such an inquiry, the parties should at least have some input into exactly what "reasonable grandparenting time" should be.

Contrary to the trial court's approach, a request for grandparenting time is not automatically included in a third-party request for custody. We, therefore, vacate that portion of the trial court's order that granted Intervener grandparenting time where the issue of grandparent visitation was not properly before the trial court.

While this would generally end our inquiry, considering the numerous errors below, we make additional observations in the event Intervener brings a proper motion before the trial court.

## C. INTERVENER'S FAILURE TO OVERCOME THE PRESUMPTION

Assuming that the matter was properly before it, the trial court nevertheless erred in permitting grandparenting time where Intervener failed to overcome the presumption that plaintiff's "decision" to deny grandparenting time did not create a substantial risk of harm to the child's physical, mental or emotional well-being.

Because grandparenting time was not an issue at the custody hearing, the presumption was never discussed. While it may be possible that Intervener could prove that failure to allow visits would create a risk of harm to the child at some future proceeding, the record, in its present form, does not support the trial court's actions. The record reveals that although there is support for the child having continued contact with Intervener, with whom she had lived her entire life, there is also evidence that Intervener's continued involvement in the child's life was potentially detrimental to the child's transition to plaintiff's home and, therefore, the child's overall well-being.

Intervener's disapproval of plaintiff exercising her parental rights was obvious, even as far back as the probate proceeding. Intervener's first two annual court reports revealed that the child and plaintiff loved one another and saw each other frequently. It was only after plaintiff moved to terminate the guardianship and a court structured plan was in place that Intervener suddenly changed the tone of her annual report: "[The child] loves being with her dad! She grows more fond every day. She is completely not interested/reluctant to see her mother. She cries every time!" Intervener reported that while "mother attends 2 hour meeting/visit once a week with [the child], [the child] does NOT enjoy, is very sad + disheartened by each visit. [The child] should not be forced to have a relationship with her mother (illegible)! [The child] should continue counseling + perhaps Miss Falconer could begin attending. [The child] has been abandoned by her mother 5 times + she is reluctant and afraid." Intervener requested that the guardianship continue because "the father would like to file for full custody but does not yet have funds to hire attorney." By all accounts except for her own, Intervener made visits as difficult as possible, objecting to DHHS's designee for supervised visits and canceling or rescheduling appointments. She would sit outside the visitation room or camp out in the bathroom down the hall. Even when advised that her actions were interfering with the child's

visits, Intervener refused to comply with requests that she leave the area and only left after security guards got involved.

Intervener's behavior was such that Candace Stack noted:

[The child's] emotional well-being is being jeopardized living with Donna Weddington. Ms. Weddington has thwarted any and all efforts of reunification between the child and her mother. It is believed that Ms. Weddington is feeding negative thoughts to [the child] about her mother, Kristen Falconer, instead of being supportive of the relationship. It is a travesty that this reunification period has not been more successful, but it is this worker's opinion this is solely due to Ms. Weddington's attitudes and actions. This worker does not anticipate that Ms. Weddington will ever support the reunification of [the child] and her mother.

Similarly, the child's GAL in the probate proceeding noted in a report:

It is this writer's opinion that Donna Weddington is so desperately afraid of losing custody of [the child] that she grasps at any straw in the attempt to prevent termination of the guardianship. It is further my belief that Donna Weddington continues to attempt to undermine this process by coaching the minor.

The lack of cooperation continued (and actually got worse) once CPS opened a case against Intervener and defendant in January 2013. The case was originally opened due to defendant's criminality and domestic violence, as well as Intervener's failure to protect the child. Workers were concerned that Intervener took the child with her when she and defendant went to confront one of defendant's "friends" over some stolen items. Defendant was badly injured during the incident when he broke through a glass window. The child was present and was upset. Intervener failed to see that such behavior placed the child at risk. There was also evidence that Intervener allowed the child to be exposed to defendant's domestic violence. Intervener excused defendant's behavior. Intervener's "enabling" behavior caused the GAL to note:

Unfortunately, Ms. Weddington – she loves her son, obviously, and she's going to protect him, and she's been there for him. But she's been there for him too much. She needs to stop protecting him and lying for him. And hopefully, she will find a way to do that, but she is enabling him, and it's a concern of mine.

If this child were to continue to be placed in the custody of Ms. Weddington, I, as the Guardian Ad Litem would find it necessary to file a neglect petition myself. I – I feel that strongly about it.

At the time of the custody trial, Intervener expressed confusion as to why the workers were concerned for the child. Intervener did not believe the child needed protection from defendant. "I don't agree that [defendant] would ever do anything to hurt his daughter, absolutely not." She added, "I never failed to protect [the child] from anybody . . .That's what I'm trying to do now," implying that the child needed protection from plaintiff in spite of the

probate court's order that the guardianship be terminated and the child be returned to plaintiff's care.

The child's therapist, Sheri Pancost, opined that the child was capable of making a healthy adjustment to living with plaintiff. The child revealed that she was afraid that plaintiff would "leave her again." Pancost indicated that this fear stemmed mostly from lack of interaction with the great grandparents up to that point, but also from the "car chase." The child, who was an infant at the time of the alleged chase, could not have possibly remembered the incident. Pancost definitely believed that if someone was saying negative things about plaintiff, that would be a problem for the child's adjustment. Pancost noted that the child "has a strong bond with [Intervener]. She feels really close to her and comfortable with her." Pancost believed it would be traumatic for the child to lose all contact with Intervener, who was the stable force in her life, but "[i]f she had visitations or something like that still, it might lessen that impact." Pancost's testimony falls far short of opining that plaintiff's "decision" to deny grandparenting time[7] created a substantial risk of harm to the child's physical, mental or emotional well-being.

Dr. Randall Haugen testified that the child had clearly been groomed, either intentionally or unintentionally. Haugen noted that the child's interpretation of events "seemed to be what she felt that grandma perceived also." Haugen warned that if the negative feelings continued, it would impact the child's function. He testified that "[c]hildren in these situations over a long period of time are really prone to develop emotionally behavioral difficulties" and negative statements create "a lot of anxiety and apprehensiveness just about her basic sense of stability, who she is, where she's going to be in the future." Haugen noted that the child perceived Intervener as "her psychological parent at this time," who met her needs but that the child had a more conflicted relationship with plaintiff because she perceived plaintiff as having abandoned her and as someone who "has a lot of problems and is really bad." The child told Haugen that she did not believe that plaintiff's love for her was true love; she believed that the love she received at home was "real" love. The child said "mommy is pretending." Haugen opined that Intervener's statements to the child that plaintiff was the child's biological mom but not her real mom were "undermining." Again, Haugen fell far short of opining that plaintiff's "decision" to deny grandparenting time created a substantial risk of harm to the child's physical, mental or emotional well-being.

It is clear beyond the shadow of a doubt that the child is well bonded to Intervener and has looked to her for care for many years. However, it is just as clear that the lower courts have ordered that plaintiff receive custody of the child, having now adequately reformed her life so that she is a fit parent. Given the presumption that a fit parent's decision to deny grandparenting time does not create a substantial risk of harm to the child's mental, physical, or emotional health, it was incumbent upon Intervener to show by a preponderance of the evidence that plaintiff made a decision that created a substantial risk of harm to the child's mental, physical, or

---

[7] Again, because grandparent visitation was not an issue at the custody trial, there was no "decision" to deny parenting time.

emotional health. Instead of receiving evidence on this issue, the trial court appears to have trumped plaintiff's discretion as a fit parent. Again, "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel*, 530 US at 72-73.

Plaintiff points to this Court's decision in *Hollis v Miller,* unpublished opinion of the Court of Appeals, entered December 6, 2012 (Docket No 306090). While not precedentially binding, MCR 7.215(C), we agree with the Court's observation:

> Plaintiff's entire argument was that a child needs a loving grandparent and some access to the maternal side of the family. However, if that were sufficient to overcome the presumption in favor of the defendant's decision, it is hard to imagine a case when the presumption would not be overcome. This would not be consistent with the Legislature's decision to set up a presumption that denial of grandparenting time by a fit parent does not create a substantial risk of harm. A trial court may not merely conclude that "grandparenting is good, therefore it should occur." [*Hollis*, slip op, p 4, quoting *Keenan v Dawson*, 275 Mich App 671, 682;739 NW2d 681 (2007).]

## D. THE AMOUNT OF GRANDPARENTING TIME ORDERED WAS EXCESSIVE

MCL 722.27b(6) provides: "If the court finds by a preponderance of the evidence that it is in the best interests of the child to enter a grandparenting time order, the court shall enter an order providing for *reasonable grandparenting time* of the child by the grandparent by general or specific terms and conditions." (Emphasis added). Once again, because grandparenting time was not an issue at the custody hearing, the issue of what was "reasonable" under MCL 722.27b(6) was never discussed at the custody hearing. The record reveals that although there is support for the child having continued contact with Intervener, with whom she had lived her entire life, there is also evidence that Intervener's continued involvement in the child's life was potentially detrimental to the child's transition to plaintiff's home and, therefore, the child's overall well-being.

We decline plaintiff's invitation to declare that only "occasional, temporary" visitation is contemplated under the grandparenting time statute. Where, as here, the grandparent's involvement in a child's life exceeds the "traditional" role of a grandparent, one could envision a visitation schedule that resembles that of a non-custodial parent. *In re Visitation of L-ADW*, 38 NE3d 993, 1000 (Ind 2015), is an example of such a situation. In that case, as here, the maternal grandparents played a significant role in the child's upbringing. They lived with the parents and the child on two separate occasions to allow the parents an opportunity to pursue their highly demanding careers and then later to help with the child as the mother was dying of cancer. Feeling that they were being cut out of the child's life after the mother's death, the maternal grandparents sought visitation under Indiana's Grandparent Visitation Act. *Id.* at 995. The trial court ordered structured and unsupervised grandparenting time, which included weekly overnight visits. *Id.* at 996 n 4. Indiana's intermediate court determined that, while grandparenting time was certainly in the child's best interests (even in light of the presumption that the father was a fit parent), the trial court abused its discretion in the amount of grandparenting time it ordered. *Id.* at 997. Indiana's highest court affirmed the decision to grant

grandparenting time, but disagreed that the amount awarded was excessive. *Id.* at 999. The high court noted:

> In the present case, the trial court considered the extensive role that Grandparents played in L–A's life from the time she was born, which far exceeded the "traditional" role of a grandparent. While living in Mother and Father's home, Grandparents largely carried out parental duties, such as cooking meals, doing L–A's laundry, taking L–A to and from school, helping with homework, reading to L–A before she went to sleep, and attending L–A's extracurricular activities. All on a daily basis. After Mother's death, Grandparents still never missed L–A's extracurricular activities. Now, Grandparents also serve as one of L–A's only connections to her deceased Mother. Even though it is not disputed that since Mother's death, Father has spent more time with L–A and developed a closer relationship with her, Grandparents were heavily involved in raising L–A up until that point. Thus, it is reasonable that the trial court would view a more involved visitation schedule as appropriate for this family. [*Id.* at 1000.]

However, of great significance (and totally absent in the case at bar), is the fact that there was extensive record evidence in the form of expert testimony supporting the trial court's decision:

> Right before Mother's passing, Laura Ellsworth, MA, a licensed mental health counselor, had been contacted by Father to assist the family in developing a parenting time schedule that would be in the best interest of L–A. After Mother's death, Ellsworth continued consulting with the family to help L–A transition from staying with Grandparents on a regular basis to being cared for primarily by Father. Ellsworth conducted multiple interviews with Father, Grandparents, and L–A to determine what was in L–A's best interest. Some interviews were conducted individually and some were conducted as group sessions. Ellsworth concluded that due to L–A's close relationship with Grandparents throughout her life, it would be in her best interest to have regularly scheduled time with Grandparents. She also found it "disturbing" that Grandparents had only three overnights and one at-home visitation with L–A in the five months following Mother's death. Despite an apparent agreement that Father would comply with the recommended schedule, the schedule was not followed.

> Grandparents also hired a mental health expert, Dr. Rebecca Luzio, in order to provide a recommendation regarding what type of visitation was in the best interest of L–A. Ellsworth and Dr. Luzio frequently consulted with one another regarding their observations. Ultimately, both testified at the visitation hearing that Father was a fit parent and that grandparent visitation was in L–A's best interest. The experts disagreed only on whether it was necessary for there to be court-ordered visitation. Ellsworth believed that Father should be allowed to determine a visitation schedule, while Dr. Luzio was of the opinion that court-ordered visitation was necessary to ensure that L–A maintained a meaningful and regular relationship with Grandparents. [*Id.* at 995-996 (internal footnotes omitted).]

-31-

While Ellsworth believed that the father should be allowed to determine a visitation schedule, her recommended schedule nearly mirrored the trial court's ultimate schedule. *Id.* at 995 n 3. This Indiana case is in no way controlling, but does support the idea that, in some very unusual circumstances, extensive grandparenting time may be appropriate. Where, as here, the child has looked to Intervener for her care her entire life, we do not believe that grandparenting visitation should necessarily be limited to only "occasional" visits. Rather, what is "reasonable" grandparenting time must be determined on a case-by-case basis, keeping the child's best interests in mind.

However, we agree with plaintiff's statement that the "design of MCL 722.27b(4)(b) and MCL 722.27b(6) is to balance the parent's fundamental Constitutional right to manage his or her child against the goal of eliminating the risk of harm to the child." The trial court made no attempt to balance these competing interests. Unlike the Indiana case, there was absolutely no testimony in this case regarding what amount of contact with Intervener, if any, was in the child's best interests. As plaintiff aptly notes, the amount of grandparenting time should have been whatever amount would have eliminated the risk of harm to the child. So, while the experts may have subtly opined that grandparent visitation was in the child's best interests given the particular history of this case, the experts offered no opinion as to the amount of grandparenting time necessary to eliminate the risk of harm to the child.

Additionally, as plaintiff appropriately notes, there is evidence that Intervener failed to follow court-ordered visitation, which would likely have an effect on the type of visitation ordered. There were a number of relevant post-trial events that took place that warrant discussion. On July 14, 2014, plaintiff filed a motion to show cause, alleging that Intervener failed to return the child after her week-long visit with Intervener. Attached to plaintiff's motion were copies of texts that went back and forth between plaintiff and Intervener. In those messages, Intervener steadfastly refused to reveal where the child was and also insisted that because the upcoming weekend was Intervener's scheduled visitation time, the vacation was really "seven days plus two", meaning that Intervener did not have to return the child on Sunday, but would return her on Tuesday. Intervener also refused to have the child call plaintiff unless she wanted and would not answer the phone when plaintiff tried calling the child. Plaintiff further argued that, based on Intervener's use of the plural "kids" in a Facebook page, that Intervener was allowing the child to have contact with defendant. Intervener had also posted the following message on Facebook: "Thinking about Megan Reynolds, Michael Khlor [sic], Candace Stack, Christian Giggy, Kathleen Keeter [sic], Megan Wilder and a few others. I hope you are having a wonderful summer so far!!" [8]

A hearing was held on July 28, 2014. The trial court found that plaintiff's inquiries about the child's whereabouts were neither harassing nor unreasonable and that plaintiff should not have to guess where the child was. It concluded that Intervener's keeping the child beyond the one-week period was contempt of court and remedied that by reducing Intervener's August visit

---

[8] During the proceedings, these individuals were critical of different aspects of Intervener's behavior.

by two days. The trial court found that Intervener's Facebook posting naming individuals involved in this case was passive-aggressive behavior but was not a technical violation of its previous order. The trial court noted: "I think it's clear that – and the Court would simply reiterate that Mr. Stamps is not to be around the child. And hopefully, in view of the contempt as it relates to the week, that Ms. Weddington will not push . . . the limits of that particular order . . .because the Court will in fact deal with that much more seriously if the issue of contempt comes back before the Court."

On September 26, 2014, plaintiff filed another motion to show cause. Plaintiff claimed that Alaura Haueter's mother, Randie Haueter (Randie) revealed that Intervener and defendant were in flagrant violation of the court's order that defendant not have contact with the child. In an affidavit, Randie averred that she had a falling out with her daughter after her daughter obtained an order preventing defendant from being at the hospital with A. Randie believed that defendant should have been allowed to see A. Because Randie was separated from her husband, Intervener offered to let Randie stay with her. It was obvious to Randie that defendant continued to live with Intervener and that he had contact with the child during Intervener's visits. Randie also noted that defendant continued to do drugs. The trial court granted plaintiff's request that Intervener's grandparenting time be suspended until further order of the court.

Intervener filed a pro per response on October 14, 2014, dismissing Randie's affidavit as an attempt to get back into Haueter's good graces so that Randie could visit her sick grandchild. Intervener denied that she allowed defendant to have contact with the child and further denied that defendant lived with her or was still using drugs.

The parties appeared before the trial court to argue the motion on October 13, 2014, but the court concluded that an evidentiary hearing was necessary. It continued the order suspending grandparent visitation until the conclusion of the evidentiary hearing. It declined Intervener's request to have at least supervised visits.

The hearing was held on November 7, 2014. Randie testified about what she had observed while living with Intervener. Intervener offered witnesses who testified that Randie was not worthy of belief. Intervener testified as well. She denied ever leaving plaintiff a voicemail recording wherein the caller indicates that "as much as you don't want him involved in your life, he's going to be involved. It's [the child's] daddy and she loves him dearly, as she does her grandmother and her aunt and her cousins." Intervener denied trying to have contact with the child in spite of the court order suspending visits. Intervener admitted that she wrote to the child and that Abbie delivered the letter and a Halloween basket to the child on the street outside of the child's school. Defendant stayed with Intervener during the week, but she explained that was so that she could make sure he was complying with services.

The trial court noted that Intervener lacked credibility and that she was evasive. It specifically noted that it recognized Intervener's voice on the voicemail in spite of her denials. The trial court was "miffed" about the denial because it called into question Intervener's overall credibility. The trial court concluded:

> And the Court does believe that the testimony does show in that particular
> matter that you did allow [the child] to be around her father, Mr. Stamps. And

-33-

based upon the testimony as a whole, the Court is going to find that you did in fact violate the court order. You are in contempt of court as a result.

***

I do believe that she has a substantial relationship with grandmother and with her Aunt Abbie in this particular case, and as a result, in deciding the remedy, the Court doesn't believe that it is in her best interest that all contact be suspended or eliminated in this matter.

But what the Court will do, in view of the violation of this order – and the order is put in place to protect [the child] – and what happens, if you're not going to protect her, this Court will protect her.

What I'm going to do is I am going to order supervised grandparent time that will occur on alternating weekends starting November 15, 2014, or alternating Saturdays from twelve o'clock noon until four o'clock p.m., and alternating holidays, with Ms. Weddington to receive Thanksgiving, again, from twelve o'clock noon to four o'clock p.m.

The trial court was amenable to adjusting the grandparenting time schedule based on Intervener's behavior but, in so doing, the trial court showed the folly of its original order granting Intervener such liberal grandparenting time without first considering expert testimony as to what would be appropriate under the circumstances. The developments that occurred after the initial order give credence to plaintiff's fears.

## E. BEST INTEREST FACTORS

Finally, the trial court's decision to award Intervener grandparent visitation was against the great weight of the evidence, at least as far as the record existed at the time of the custody trial.

The trial court considered the best interests factors in MCL 722.27b(6).

1. (a) the love, affection, and other emotional ties existing between the grandparent and the child

The trial court noted: "I've already addressed that as it relates to the custody issue of the Child Custody Act, and as the Court found that that factor was equal as to the parties in this particular case, the Court does find that in fact that factor would favor grandparent visitation at this time." Plaintiff does not challenge this finding.

2. (b) the length and quality of the prior relationship between the child and the grandparent, the role performed by the grandparent, and the existing emotional ties of the child to the grandparent

The trial court noted that this factor favored visitation without discussion. Plaintiff complains that the trial court failed to consider the fact that the relationship was not healthy for the child. Absent an explanation from the trial court, we agree. When it analyzed factor (b)

-34-

under the CCA – the capacity and disposition of the parties to give the child love, affection, and guidance – the trial court noted:

> As it relates to guidance, the – Ms. Weddington had allowed her son and the Plaintiff in her home to engage in sexual relations during the time that they were minors resulting in the birth of this child. She's allowed them in both – in her house as well when they were both engaging in drug use, when she knew that, when she had in essence two minor children in the household.

> Additionally, Ms. Weddington took [the child] when this – when Mr. Asher was being confronted [during the home invasion incident]. And basically, when she was questioned extensively . . . she showed a total lack of judgment as to how this could have been a dangerous situation for [the child].

There was significant domestic violence in Intervener's home perpetrated by defendant, whom Intervener constantly enabled. The child was placed in danger when Intervener decided to take her along on a confrontation defendant had with a friend, which is part of the reason she was substantiated for neglect. There was evidence that, even when forbidden to do so, Intervener allowed defendant to have contact with the child. Moreover, the child had clearly been coached. Haugen testified that such coaching damaged the child's emotional well-being.

Additionally, when looking at factor (d) under the CCA best interest factors– the length of time the child has lived in a stable satisfactory environment and the desirability of maintaining that environment – the trial court concluded that Intervener's many moves and the lack of safety caused it to "slightly" favor plaintiff.

### 3. (c) the grandparent's moral fitness and

### (d) the grandparent's mental and physical health

The trial court found that factors (c) and (d) weighed against visitation for the same reason it found against Intervener in the custody analysis. In its custody analysis, the trial court had noted that "neither party has an exemplary history as it relates to [moral fitness]." It also noted, however, that Intervener's behavior of pandering to or condoning defendant's behavior caused it to "slightly" favor plaintiff. On appeal, plaintiff complains that the trial court did not give sufficient weight to this factor, pointing out that the trial court had found that Intervener had intentionally lied while testifying, lied to police to prevent defendant from being arrested, excused her son's bad behavior, and intentionally alienated the child from plaintiff. Again, absent a more detailed finding, we are inclined to believe that the trial court failed to give this particular factor proper weight.

### 4. (e) the child's reasonable preference, if the court considers the child to be of sufficient age to express a preference

The trial court considered the child's reasonable preferences. As the plaintiff correctly notes, there was little value in interviewing the child where the evidence at trial clearly revealed that she had been coached.

5. (f) the effect on the child of hostility between the grandparent and the parent of the child

The trial court noted:

It does appear that the parties have been able to in fact get along somewhat as it relates to the exchanges, et cetera, and as a result the Court will find that in fact, hopefully, the parties can get past any animosity they have when this case is concluded, but the Court will find that that factor does favor grandparenting time.

In fact, hostility permeated these proceedings. Intervener tried to prevent plaintiff from attending a doctor's appointment for the child or visiting the child's school. Intervener was twice held in contempt of court for failing to follow court orders regarding grandparenting time. Intervener made Facebook postings in which plaintiff was described as mentally ill and a stranger to the child. Both Pancost and Haugen testified that the child's emotional well-being was in peril when Intervener made negative comments about plaintiff. The trial court erred in finding that the factor favored grandparenting time.

6. (g) the willingness of the grandparent, except in the case of abuse or neglect, to encourage a close relationship between the child and the parent or parents of the child

The trial court concluded that, for the same reasons set forth under the custody factor (j) (willingness and ability to facilitate and encourage a close and continued relationship), the factor did not favor visitation. In analyzing factor (j), the trial court had concluded:

In this particular matter, the testimony was that Ms. Weddington, when the Plaintiff went to the doctor's office, that Ms. Weddington told her to wait in the lobby. Ms. Weddington told the Plaintiff that --- when she was at school that she was not welcome at school. She told her she wouldn't be able to – she wouldn't be able to get a report card without a court order, and she – Ms. Weddington objected to having the maternal grandparents supervise any parenting time.

And the Court, likewise, believes as it relates to this issue of the car chase, there was this car chase in which she basically characterizes it a car chase, the Court doesn't – believes that they were followed, but the Court doesn't believe that it was a car chase in this particular matter. And *I think that the way that Ms. Weddington has approached a number of things in this matter have in fact impacted the way that [the child] views her mother in this particular case*.

Ms. Haueter testified that Ms. Weddington and the Defendant discussed the Plaintiff in front of [the child] and the – basically *the only reason for such conduct would be to alienate the child from the parent*.

Ms. Weddington is likewise – has a – a Facebook post that she admitted to, stating that [the child] was living with a stranger and at a stranger's home and feeling so sad. In this particular case, at some point, the child would be able to view that and see that, and that *is not conducive to establishing a parent/child relationship*.

-36-

Additionally, when Ms. Weddington was questioned by Mr. Clore back on June 18th as to whether she credited Plaintiff with any improvement, Ms. Weddington would not acknowledge that she had improved her life in any way. She wouldn't even acknowledge the improved housing, the stable job, and she wouldn't acknowledge that the Plaintiff had in fact gained control of her drug issues; notwithstanding the fact that she had had a number [of] negative drug tests.

These statements and conduct *belie any ability on behalf of Ms. Weddington to establish and continue a parent/child relationship between [the child] and the Plaintiff mother*.

So as a result, the Court will find that that factor does favor the Plaintiff mother. [Emphasis added.]

On appeal, plaintiff complains that the trial court did not give sufficient weight to this factor. We are inclined to agree.

7. **(h) any history of physical, emotional, or sexual abuse or neglect of any child by the grandparent**

The trial court did not give the factor weight even though Intervener had been substantiated for neglect. Incredibly, the trial court noted that it was "mindful of the CPS investigation in this particular case, and the Court will consider that, but the Court feels that to be minimal in this particular matter on that particular action, so I'm not giving a lot of – of weight in this particular case." CPS substantiated Intervener for her failure to protect the child from defendant's criminal and violent behavior. That was perhaps *the* theme of the entire custody debate – whether and if Intervener was capable of protecting the child. It was error for the court to minimize this factor, especially when it should have considered that, not only was Intervener substantiated, but she was completely uncooperative.

8. **(i) whether the parent's decision to deny, or lack of an offer of, grandparenting time is related to the child's well-being or is for some other unrelated reason**

The trial court concluded that it did not feel that plaintiff acted out of ill will "but the Court does find that in fact it would adversely affect the minor child if this contact was cut off." Again, "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel*, 530 US at 72-73. Plaintiff was determined to be a fit parent and the trial court found that plaintiff's "decision" to disallow grandparenting time was not motivated by ill will. The trial court simply substituted its judgment for plaintiff's.

9. **(j) any other factor relevant to the physical and psychological well-being of the child**

Finally, the trial court noted that the child had come to depend upon Intervener and, therefore, the factor favored grandparenting time. Once again, absent any expert testimony on this direct issue, the trial court appears to have given this factor undue weight.

After weighing all of these factors, the trial court concluded that "the grandmother has met the burden by a preponderance of the evidence that in fact it would be a – the child would be placed at substantial risk of harm to the child's mental, physical, and emotional health if in fact that contact is cut off."

We once again note that the issue of grandparenting visitation was not properly before the court. We also agree with plaintiff that when taken as a whole, and on this record, the factors "strongly predominate against any grant of visitation."

That portion of the trial court's order granting grandparenting visitation is vacated. The custody order is otherwise affirmed. The trial court is further directed not to revisit the issue of grandparenting time unless Intervener brings a proper motion under MCL 722.27b(3). As the prevailing party, plaintiff may tax costs. MCR 7.219.

/s/ Kirsten Frank Kelly
/s/ Michael F. Gadola
/s/ Karen M. Fort Hood