*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CLAUDE HALSTEAD,

UNPUBLISHED
May 5, 2022

Plaintiff-Appellee,

v

No. 358181
Crawford Circuit Court
LC No. 10-008308-DM

KELLY HALSTEAD,

Defendant-Appellant.

Before: RONAYNE KRAUSE, P.J., and MURRAY and O'BRIEN, JJ.

PER CURIAM.

Defendant, Kelly Halstead, appeals by right the trial court's order awarding sole legal custody of the child, KH, to plaintiff, Claude Halstead. We reverse and remand.

## I. BACKGROUND

The parties were married in 1998. Two of the parties' children are now adults and not at issue in this matter: KHH, born in 1999, and CMH, born in 2002.[1] Plaintiff filed for divorce in early 2010, following which the parties apparently briefly reconciled, and the child at issue, KH, was born in early 2012. The parties' judgment of divorce was entered on August 3, 2012. The parties were granted joint legal custody of all three children. The parties were also granted joint physical custody of KHH and CMH; defendant was granted sole physical custody of KH with "parenting time as agreed between parties." In 2015, plaintiff moved to establish parenting time with KH and obtain joint physical custody of KH. Plaintiff was granted parenting time, but his motion for joint physical custody was denied because he did not establish proper cause or a sufficient change of circumstances. Meanwhile, both parties entered into relationships with new partners.

---

[1] Some documents in the lower court record list various other years for CMH's birth date, but these references appear to be erroneous.

In April 2020, plaintiff filed an ex parte motion for temporary physical custody of KH, contending that recent changed circumstances placed KH in jeopardy with defendant. Plaintiff alleged that defendant had recently divorced, moved to an undisclosed location, refused to provide plaintiff with her new location, and could not drive. Plaintiff further alleged that defendant's now-former partner had reported that defendant "isn't in the right state of mind to properly care for [KH]." Furthermore, plaintiff alleged that defendant and another child in her current residence had been diagnosed with influenza-B, which, because of the stay-at-home orders in effect due to the COVID-19 pandemic, made it likely KH would be exposed to influenza-B. As would later be clarified, defendant and KH had, in January 2020, moved out of the residence that defendant shared with her prior partner and into a domestic violence shelter. By late April or early May 2020, defendant and KH had moved into a residence with defendant's new partner and then-fiancé. Defendant's moves did not interfere with plaintiff's parenting time, although plaintiff did not become aware of the changes in defendant's living situation until after the fact. Defendant provided the address of the shelter to the Friend of the Court, but she explained that the shelter had a number of rules, one of which was that she should not disclose the address.

Plaintiff sought the change of custody on an emergency and ex-parte basis because the courts were then closed due to the COVID-19 pandemic. The trial court promptly denied the ex parte motion, finding that "[p]laintiff has not pled facts warranting ex parte relief. Plaintiff may file a motion and set it for hearing if he wishes."

Thereafter, plaintiff unilaterally refused to return KH following plaintiff's weekend visitation that was scheduled to end on May 17, 2020. On May 26, 2020, defendant and her then-fiancé went to plaintiff's house to see KH. As will be discussed, this attempted visit went poorly, resulting in distress to KH and plaintiff obtaining a PPO against defendant. The trial court would later opine that the events of that day reflected less than exemplary behavior on the part of both parents. In June 2020, defendant filed a complaint that plaintiff was violating the parties' parenting time order. A month later, the trial court agreed that plaintiff was in violation of the parenting time order, ordered plaintiff to return KH to defendant immediately, and ordered that defendant would receive make-up parenting time. It also ordered the parties to communicate regarding parenting time by text message through defendant's new partner.[2]

Also in June 2020, plaintiff filed a motion to modify custody and parenting time. Plaintiff alleged that KH had an established custodial environment with himself, and KH previously had an established custodial environment with defendant's former partner, who plaintiff alleged had actually been KH's primary caretaker. Plaintiff further alleged that defendant's divorce from that partner, defendant's move to a shelter, defendant having recently been to the hospital emergency room, and the former partner's report that defendant "has begun using drugs again" constituted proper cause and a change of circumstances to modify custody. Plaintiff contended that he could provide KH with support and stability, whereas defendant could not. A lengthy evidentiary

---

[2] A recurring theme was poor communication between the parties, much of which was routed through their respective partners. Plaintiff apparently had a reasonable working relationship with defendant's former partner and, as will be discussed, stated that he would not have sought to change custody if defendant had not broken up with that former partner.

-2-

hearing regarding plaintiff's motion was held before a referee over three days, with testimony mostly limited to events occurring after the 2015 custody order. Plaintiff never sought to change legal custody of KH, and the evidentiary hearing focused on physical custody.

Testimony was introduced from defendant's former partner, two of the former partner's children, plaintiff's wife, a doctor who shared a practice with one of defendant's doctors, the parties' middle child CMH, defendant's then-fiancé, a friend and neighbor of defendant, and both parties. Plaintiff testified that he would not have sought to change custody if defendant was still with her former partner. He also testified that he never missed any parenting as a result of defendant's moves. Rather, he believed that he was entitled to know where his daughter was living, he was concerned that defendant had not told him about her breakup and her move, and he believed defendant's former partner had been KH's primary caregiver. He was not aware of KH being neglected by defendant while defendant's former partner was at work.

Defendant's former partner and her children generally expressed concern that defendant spent much of the time sleeping, seemingly under the influence of drugs, and generally unavailable and delegating a significant portion of care and parenting of KH to others. However, the former partner's daughter testified that she only visited a few times a year after 2015, the former partner's son testified that defendant and the former partner both parented KH, and the former partner testified that she did not observe plaintiff abusing drugs other than a single incident in 2016. Furthermore, defendant babysat every day for two little boys, and the former partner was unaware of any issues with those children. The doctor testified that defendant had struggled with illicit drug use in 2013, but other than a relapse incident in 2016 following which defendant's medications were changed, defendant was now compliant and getting regular drug screens along with her treatment for a number of medical conditions. CMH testified that he lived primarily with plaintiff, that he had smoked marijuana with defendant in 2016, that he was concerned about defendant's ability to parent KH because of her "old drug addictions" and her sleeping all the time, and that defendant's partner had been KH's primary caregiver. However, he was unaware of KH being injured or neglected in defendant's care, and he had not seen defendant recently.

Defendant's then-fiancé, an emergency room EMT who had substantial experience with addicts, testified that she was aware that defendant had a history of drug abuse, but had no present concerns about defendant caring for children or abusing her medication. She testified that defendant got up in the mornings and assisted in getting both KH and the fiancé's child ready for school. She opined that "we live a pretty boring life." Defendant's friend and neighbor testified that defendant babysat her youngest child weekly, and she saw defendant daily. She opined that defendant and KH had a great relationship, that defendant played with the various neighborhood children, and defendant had helped with one child's behavioral issues. The friend was also aware that defendant had drug abuse problems in the past, but had no concerns about defendant now.

Defendant admitted that she had relapsed on drugs in 2016, and she told plaintiff about the relapse a month later. She opined that it was a "one-time thing." Shortly thereafter, she tested positive for fentanyl because the pain clinic where she was receiving treatment accidentally gave

-3-

her the wrong drug, a claim she supported with a medical record from the clinic.[3] Defendant testified that she left her previous partner because her previous partner abused her psychologically and physically. While at the shelter, she was taken to the hospital because she had been ill and taken some leftover antibiotics originally prescribed to KH, but she then suffered an allergic reaction to those antibiotics. Defendant testified that plaintiff always had his scheduled parenting time with KH. Furthermore, she testified that she attended KH's parent-teacher conferences and kept plaintiff apprised of those meetings and of medical appointments, but plaintiff had not involved himself in KH's education or medical needs. Defendant also testified that CMH suffered broken bones and concussions while in plaintiff's care, but defendant was never timely informed her about those injuries, and some were not disclosed to her at all. Defendant testified that she had been diagnosed with hepatitis C in 2020 after complaining of constant fatigue, and after completing treatment later that same year, she had more energy.

Several witnesses provided differing accounts of the incident that occurred on May 26, 2020, while plaintiff was keeping KH in violation of the parenting time order. That afternoon, defendant and her then-fiancé showed up at plaintiff's house to see KH. It was generally agreed that, when they showed up, plaintiff's wife took KH and the wife's child inside, and KH experienced some degree of distress. The witnesses differed as to whether the fiancé banged on the gate and the extent to which defendant yelled. Following that incident, plaintiff obtained a PPO against defendant and enrolled KH in counseling. At the conclusion of the evidentiary hearing, the referee found no proper cause or change of circumstances that would warrant consideration of a change of custody. The referee opined that the evidence did not support plaintiff's belief that KH was in danger due to drug abuse or neglect by defendant, and plaintiff had seemingly found it difficult to adapt to dealing with defendant directly instead of through defendant's former partner. The referee recommended denying plaintiff's motion.

Plaintiff objected to the referee's recommended order. The trial court reviewed the evidentiary hearing and then made a bench ruling that mostly affirmed the referee. In particular, the trial court agreed with the referee that plaintiff had failed to establish proper cause or a change of circumstances to warrant a change of physical custody. However, the trial court *sua sponte* went beyond plaintiff's objections and stated:

> where I would differ with the Referee, and I think is quite clear, is that you guys have joint legal custody and it's quite clear to me that you have not followed the tenants [sic] of joint legal custody. Either one of you. . . . [T]he idea behind joint legal custody is that you're gonna cooperate with each other as parents, and both be involved in major decisions related to the minor child[.]
>
> So, you know, from [plaintiff] I'll just give you [an] example of [defendant] identifying she didn't know about [CMH]'s concussions from—and injuries from wrestling and other things he was doing until kind of getting into this case.

---

[3] There appears to be no dispute that the fentanyl incident really was an accident by the clinic and no fault of defendant.

> [Defendant], for [plaintiff], he has, I think very legitimate concerns that can't be brushed away. That, that are appropriate for him to have. And what I mean by that is, the example of one, if you're suffering from domestic violence that's something that [plaintiff] should be made aware of. Because your daughter's in that setting and he would have a legitimate concern about her welfare.
>
> If you're moving. He should know where you're moving. If you're moving in with somebody else that your daughter's going to exposed to he should know who that is and be able to meet them, and do things like that. If you have a drug overdose he should be made aware of that because it may impact your ability to parent. And he would need to know whether or not Kai was safe.
>
> And, and so in the court[']s standpoint the one error I do find with regard to the ruling by the Referee is there was no change to legal custody.

The trial court emphasized its belief that defendant made a mistake in 2016, which might have warranted changing physical custody at that time, but on the basis of defendant's subsequent recovery, plaintiff's motion was simply too late. However:

> I am gonna change legal custody. I'm gonna leave physical custody as it is. I'm gonna tell both parties that – and this is probably more important for you [defendant]. Is that it has the potential to change physical custody later if it's not being followed. I'm gonna grant sole legal custody to [plaintiff] because I think there have been some issues here in terms of some insight and decision making by you [defendant].

The trial court ordered defendant to provide plaintiff with records and updates from her doctor so that plaintiff could determine that she really was recovering, to refrain from using anyone else's prescription medications, and to inform plaintiff immediately if she became hospitalized or went back to a shelter. It chastised both parties for their roles in the May 26 incident and for their failures in communicating with each other. Defendant protested that she had attempted to work with plaintiff and he had refused, to which the trial court responded that she would have to try or risk losing physical custody as well. The trial court concluded by flatly stating that it would not restore joint custody, unless perhaps "if you two were to work together for some prolonged period of time and wanted to come back and tell me now you could do it." The trial court entered an order on March 12, 2021, modifying the legal custody of KH from joint legal custody between the parties to sole legal custody with plaintiff.

Defendant moved for reconsideration. The trial court rejected defendant's arguments that it was not permitted to change legal custody unrequested or without finding proper cause or a change of circumstances, but it agreed that the parties were entitled to supplement the record and that it would need to engage in an analysis of the best-interests factors. It also stated that after supplementation of the record it would "analyze whether proper cause exists to modify the joint legal custody of the parties." Both parties testified at the ensuing evidentiary hearing. In addition, defendant presented testimony from a counselor who had seen KH weekly from September 2020 through April 2, 2021; and from the principal at the elementary school KH was attending.

The counselor testified that defendant had brought KH to sessions, and at the end of March 2020, plaintiff contacted her to advise her of the change of legal custody and request that she direct all scheduling and other questions to him. She believed that she had a good therapeutic relationship with KH, and plaintiff initially seemed inclined to continue KH's therapy. However, on April 6, 2021, plaintiff left her a voice mail "stating that [she] should consider all future appointments cancelled, and to call and talk to him if [she] had any question." The counselor attempted to contact plaintiff, but he never responded. The counselor opined that "bouncing a child from therapist to therapist can make therapy less effective for the child," and KH had already switched counselors twice (one of whom had to be replaced because that counselor left the state). The counselor was aware that defendant's fiancé was the daughter of the counselor's supervisor, but emphasized that the supervisor was obligated to maintain confidentiality and was unaware that plaintiff had any concerns about the supervisor.

The school principal testified that he had very little direct involvement with individual students, and most contact would be through teachers. The principal testified that in March 2021, he was contacted by plaintiff, who asked to add his wife and defendant's former partner as emergency contacts, and also to remove several contacts that had previously been provided by defendant. Plaintiff also demanded that all records and information be sent only to him, and he stated that he would pass information on to defendant. The principal asked plaintiff to provide "court documentation" to prove he had the authority to make that change. Plaintiff never did so; rather, he only provided a letter from his attorney, even after the principal subsequently told plaintiff that he needed a court document. The principal therefore had no way to verify whether plaintiff really had any authority to make decisions for KH. The principal was also concerned that the names plaintiff wanted added lived at least an hour and a half away, which would be a problem if KH "is sick, or needed something immediate." Plaintiff did eventually provide the principal with a release to allow the school to provide information directly to defendant.

Plaintiff admitted that he never provided the principal with a copy of the court's order. He pointed out that he had not previously been listed as a contact for KH at the school, which he felt was inappropriate even though he lived some distance away. He contended that he had not attended any school meetings at KH's current school because of the distance and because he had been "left in the dark." Nevertheless, he also admitted he previously had joint legal custody and access to the app used by the school for managing interactions with parents, although he became more involved with it after gaining sole legal custody. He did not recall defendant keeping him apprised of parent teacher conferences, and he admitted he never previously reached out to the school. He made some changes to KH's medical care after gaining sole legal custody, which he explained was initially in an effort to keep KH's treating doctors more local to defendant and within coverage by his insurance. Plaintiff was also concerned about KH receiving "better choices" of healthy food.

Plaintiff changed KH's counselor because he believed "there was information being leaked" through the counselor's supervisor.[4] He opined that the prior counselor was "a wonderful therapist," but he believed KH had changed for the better and was "more interactive" with him since changing counselors. Nevertheless, he admitted that KH had only seen her new counselor once so far. Furthermore, he admitted that he learned of the former counselor's supervisor in January, but despite having joint legal custody at that time, he never attempted to bring his concerns to defendant's attention. On March 22, 2021, plaintiff informed defendant by text message that she "broke the court order" by taking KH to her counselor, stating that "from here on out I am making all of [KH's] doctor appointments and I'll be keeping you informed." However, he did permit her to take KH to the emergency room if she was bleeding or had a broken bone without first informing plaintiff.

Plaintiff believed that everything had previously been "one sided" with defendant, but now everything was "working fantastic." He also believed that defendant's participation in parenting had likewise improved, and he noted that the parties had coordinated to allow defendant to take KH camping.

Defendant disputed plaintiff's characterization of their communication improving since the change of legal custody. She explained that she had previously kept plaintiff informed of medical appointments, school conferences, and other educational or medical matters, to which plaintiff merely provided terse acknowledgements. She testified that plaintiff never affirmatively reached out to her. Since the change of legal custody, she opined that

> since the legal change it's only gotten worse. I think he's on a power trip and it's – he says it's my way or no way, but it's the complete opposite. And I just – I don't understand.

She opined that KH was "stuck in the middle." Defendant further stated that she had been "black listed from making any appointments" and not allowed to attend some of KH's appointments, leading her to feel she did not "have any say so in my own child." She believed that she was not even realistically able to seek medical attention for KH when necessary, and plaintiff had threatened to put her in contempt if she tried. In addition to forbidding defendant from attending some medical appointments, defendant stated that

> He just says I have sole legal custody and what I say goes basically. Or just the simple no, or he just doesn't answer me.

She believed that because KH spent more time with her, she was in a better position to know KH's medical needs. She also believed that matters were only likely to get worse, and plaintiff's control over medical and educational decisions and information interfered with her ability to parent KH. Defendant admitted that plaintiff had not been on the school's emergency contact list. However,

---

[4] The trial court opined that plaintiff's suspicions were understandable, but they were probably based on a misunderstanding of the supervisor's confidentiality obligations and how involved the supervisor would have been in KH's therapy.

she believed the list only governed who could pick KH up, and she opined that because plaintiff was KH's father, he did not need to be on the list.

The trial court issued a bench ruling. The trial court impliedly recognized that it could not change established legal custody without finding proper cause or change of circumstances. However, it opined that it was unclear whether "the parties had any kind of a joint established custodial environment with regard to legal custody," and even if they did, their respective failures to communicate and cooperate had destroyed any such established custodial environment. The trial court therefore concluded that it needed to determine the best interests of KH by a preponderance of the evidence.[5] The trial court then analyzed each of the statutory best-interests factors under MCL 722.23, ultimately finding them to generally favor plaintiff. It therefore concluded that awarding plaintiff sole legal custody remained appropriate.

However, it explained to the parties that legal custody entailed making "big decisions" or "macro issues," and physical custody entailed "micro issues." Therefore, for example, it believed defendant had the right to decide who would pick KH up from school, and it would be up to plaintiff if there were "safety implications or some kind of bigger systems approach issue that needs to be addressed." It emphasized that plaintiff was not entitled to micromanage KH or defendant, that he ought not to change established procedures just because he had the authority to do so, and that testimony from the reconsideration evidentiary hearing suggested that plaintiff might have exceeded his authority or inappropriately used that authority "as a sword to kind of stick [defendant]." It further emphasized that plaintiff's spouse was not entitled to make decisions, which the trial court suspected might be occurring. It therefore explained that although plaintiff was entitled to choose which professionals would see KH or make major medical decisions like surgery, defendant had a right to take KH to the emergency room or urgent care, defendant had a right to take KH to her medical appointments, and defendant had a right to decide to take KH home from school if she was ill. Furthermore, both parties were "entitled to know about what's happening with [KH]" at school. The trial court implied that it might revisit the matter of custody if plaintiff, on his own behalf or on behalf of his spouse, attempted to micromanage KH or defendant. The trial court entered an order awarding sole legal custody to plaintiff "for reasons articulated on the record," and this appeal followed.

## II. STANDARDS OF REVIEW

In a child custody dispute, "all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. This Court reviews a trial court's findings, including a showing of proper cause, a change of circumstances, the existence of an established custodial environment, and the best-interests factors, to determine whether the findings were against the great weight of the evidence. *Corporan v*

---

[5] As will be discussed, when changing custody of a child, the trial court must find that doing so is in the child's best interests. If there is no established custodial environment, the trial court need only find the child's best interests by a preponderance of the evidence; whereas if there is an established custodial environment, the trial court must find the child's best interests by clear and convincing evidence. *Pierron v Pierron*, 282 Mich App 222, 244-245; 765 NW2d 345 (2009).

*Henton*, 282 Mich App 599, 605; 766 NW2d 903 (2009). A trial court's finding is against the great weight of the evidence if "the evidence clearly preponderates in the opposite direction." *Id*. (quotation omitted). "An abuse of discretion standard applies to the trial court's discretionary rulings such as custody decisions. *Id*. (quotation omitted). "An abuse of discretion, for purposes of a child custody determination, exists when the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Butler v Simmons-Butler*, 308 Mich App 195, 201; 863 NW2d 677 (2014) (citation omitted). Questions of law are reviewed for clear legal error, meaning the trial court "incorrectly chooses, interprets, or applies the law." *Corporan*, 282 Mich App at 605 (quotation omitted).

### III. *SUA SPONTE* CONSIDERATION OF LEGAL CUSTODY

We first address defendant's contention that the trial court was not permitted to consider or change legal custody where plaintiff never requested a change to legal custody. We conclude that the trial court was not absolutely prohibited from *sua sponte* considering legal custody despite plaintiff only requesting a change of physical custody, but we conclude that it was error for the trial court to do so under the particular circumstances of this case.

If a trial court *sua sponte* addresses and decides an issue that was not properly before it, the trial court's decision may be subject to vacation or reversal. See *Falconer v Stamps*, 313 Mich App 598, 646-648; 886 NW2d 23 (2015). However, "addressing a controlling legal issue despite the failure of the parties to properly frame the issue is a well understood judicial principle," and "the parties' failure or refusal to offer correct solutions to" an issue does not limit an appellate court's "ability to probe for and provide the correct solution." *Mack v Detroit*, 467 Mich 186, 207; 649 NW2d 47 (2002). The fact that no party adequately briefed or explored a particular issue does not necessarily mean the trial court was precluded from considering the issue, and it is not dispositive of whether the issue was properly before the court. Nevertheless, we cannot conclude that the *only* prerequisite to a trial court raising an issue *sua sponte* is whether the court affords the parties an opportunity to address the issue.

In *Falconer*, this Court vacated a trial court's award of grandparenting time because the proceeding was a custody dispute, and grandparenting time was an entirely different cause of action and "not automatically included" in a custody request. *Falconer*, 313 Mich App at 642, 648. However, a "child custody dispute" means "any matter that relates to the custody of a child from the time the issue of custody arises until the child reaches the age of majority." *Phillips v Jordan*, 241 Mich App 17, 23 n 1; 614 NW2d 183 (2000). "While the Child Custody Act draws a distinction between physical custody and legal custody, *Vodvarka* [*v Grasmeyer*, 259 Mich App 499; 675 NW2d 847 (2003)] referenced 'custody' as logically referencing both legal and physical custody." *Merecki v Merecki*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 353609); slip op at 4. Nevertheless, "the Legislature divided the concept of custody into two categories—custody in the sense of the child residing with a parent and custody in the sense of a parent having decision-making authority regarding the welfare of the child." *In re AJR*, 496 Mich 346, 361; 852 NW2d 760 (2014). "Physical custody pertains to where the child shall physically reside, whereas legal custody is understood to mean decision-making authority as to important decisions affecting the child's welfare." *Grange Ins Co of Mich v Lawrence*, 494 Mich 475, 511; 835 NW2d 363 (2013) (quotation omitted).

Unlike grandparenting time, legal and physical custody both fall within a "child custody dispute." Therefore, where one is directly before a court, the other *could be* properly also before the court by necessary implication, even if not expressly raised by either party. Nevertheless, they are sufficiently distinct that one does not *necessarily* implicate the other. In other words, where one form of custody is expressly before the court, the court could, under proper circumstances, conclude that it was necessary to also address the other form of custody. This is especially true given the circuit court's de novo review of the referee's findings. We need not consider under which circumstances such an implication would arise, because they clearly did not arise in this case and under these circumstances.

Importantly, courts ought to be cautious in addressing issues or granting relief outside the bounds of the parties' requests, even where such consideration is not precluded. The trial court did not exercise a proper degree of caution in this matter, and the facts do not support the trial court's conclusion that legal custody was properly before it. Not only did plaintiff never seek a change in legal custody, plaintiff never even tried to involve himself in the kinds of decisions implicated by legal custody. There was no evidence whatsoever that the parties had any disagreements about KH's education or medical care. Defendant left an abusive partner and entered into a new relationship: the former is a tragic situation that defendant was absolutely entitled to remedy, and the latter is merely an ordinary life change, over which, as will be discussed, plaintiff sought to exercise a degree of control to which he was not entitled. The trial court erred in concluding that legal custody was properly before it, such that it could consider changing legal custody. Furthermore, as will be discussed, even if the trial court's *sua sponte* consideration of legal custody had been proper under the circumstances, the trial court committed additional errors that would independently require reversal.[6]

## IV. PROPER CAUSE OR CHANGE OF CIRCUMSTANCES

Defendant further argues that the trial court erred in stating that it was not required to find proper cause or change of circumstances before changing KH's legal custody. We agree.

### A. PROCEDURE

Before modifying or amending a custody order, the circuit court must determine whether the moving party has demonstrated either proper cause or a change of circumstances to warrant reconsideration of the custody decision. MCL 722.27(1)(c); *Vodvarka*, 259 Mich App at 508-509. The movant has the burden of proving by a preponderance of the evidence that either proper cause or a change of circumstances exists. *Vodvarka*, 259 Mich App at 509. If the movant fails to make a threshold showing of proper cause or change in circumstances, the trial court is precluded from holding a best-interests hearing. *Vodvarka*, 259 Mich App at 508. Technically, there was no

---

[6] However, we disagree with defendant's contention that the trial court impermissibly bifurcated legal and physical custody. The trial court did not "treat[] the two forms of custody differently." *Merecki*, ___ Mich App at ___; slip op at 4. Although it was error for the trial court to consider legal custody at all under the circumstances, and the trial court erred on the facts even if it had been permitted to consider legal custody, it did not bifurcate the two forms of custody merely by addressing one after the other.

-10-

"moving party" seeking to change KH's legal custody in this matter, but plaintiff effectively embraced that role and should be treated as such.

The trial court initially held that it was not obligated to make a finding of proper cause or change of circumstances before changing legal custody, because it believed doing so would not alter the child's established custodial environment. This was incorrect. Legal custody refers to the "decision-making authority as to the important decisions affecting the welfare of the child," MCL 722.26a(7)(b), including decisions such as health care, education, and religion, see *Bofysil v Bofysil*, 332 Mich App 232, 249; 956 NW2d 544 (2020). A parent without legal custody does not have legal authority to make major decisions on behalf of the child. A change from joint legal custody to sole legal custody would necessarily alter the decision-making authority as to important decisions affecting KH's welfare. The trial court is required to determine whether there was proper cause or change of circumstances as a prerequisite to determining whether there was an established custodial environment. *Vodvarka*, 259 Mich App at 509, 511; see also *Pierron v Pierron*, 283 Mich App 222, 243-244; 765 NW2d 245 (2009). The trial court made a clear legal error by concluding that a change in legal custody does not affect a child's established custodial environment merely because the child's physical environment might not change. In addition, changing who has the authority to make major decisions in a child's life would inevitably affect, at least to some extent, how the child interacts with either parent.

It is clear from reading the trial court's bench ruling as a whole that it was convinced that the parties' inability to communicate and cooperate made an intervention necessary. "Proper cause" and "change of circumstances" both require a determination, based on the particular facts of the case, that some condition in the child's life is having, or could have, a significant effect on the child's well-being. *Vodvarka*, 259 Mich App at 511-514. Nowhere did the trial court reflect on what harm, if any, KH was suffering. Rather, as will be discussed further, the trial court was clearly concerned with the effect the parties' difficulties cooperating was having on plaintiff. Therefore, the trial court never satisfied the substantive prerequisites to engaging in that consideration.

Additionally, the overriding goal in child custody matters is to avoid unnecessary disruptions to a child's life. See *Vodvarka*, 259 Mich App at 511. As the trial court correctly recognized, it committed a procedural error when it entered an order effectuating the change of legal custody before affording the parties an opportunity to address the issue and introduce evidence relevant to that issue. See *Fawley v Doehler-Jarvis Div of Nat'l Lead Co*, 342 Mich 100, 102; 68 NW2d 768 (1955). The trial court addressed that error by granting the parties reconsideration and an evidentiary hearing. *Al-Maliki v LaGrant*, 286 Mich App 483, 485-486; 781 NW2d 853 (2009). However, although this Court in *Al-Maliki* held that "[w]here a court considers an issue sua sponte, due process can be satisfied by affording a party an opportunity for rehearing," this Court did so in the context of civil litigation for money damages, not in the context of a child custody proceeding. See *id*. The distinction is critical: money is fungible and replaceable, whereas childhoods are not. Furthermore, this Court held that due process *can* be satisfied by an after-the-fact rehearing, not that due process necessarily *is* satisfied. Under the circumstances, we cannot conclude that the trial court fully cured its error. Rather, the trial court's change in legal custody *before* giving the parents an opportunity to be heard on the issue generated exactly the kind of disruption to KH's life that should be avoided.

## B. FACTUAL DETERMINATIONS

The trial court's ruling is, finally, lacking in any explanation of how KH was actually or potentially suffering harm as a result of the parties having joint legal custody and difficulties cooperating.

"In order for joint custody to work, parents must be able to agree with each other on basic issues in child rearing—including health care, religion, education, day to day decision making and discipline—and they must be willing to cooperate with each other in joint decision making." *Fisher v Fisher*, 118 Mich App 227, 232; 324 NW2d 582 (1982). However, "cooperation is only one factor for the court to consider in its decision to grant or deny joint custody." *Nielsen v Nielsen*, 163 Mich App 430, 434; 415 NW2d 6 (1987). In *Fisher*, sole custody was appropriate because the parents had an irreconcilable conflict regarding their child's religious upbringing. *Fisher*, 118 Mich App at 233-234. In *Nielson*, sole custody was inappropriate because the children had not been suffering under the established joint-custody arrangement, and the parents' personal animosity and disputes regarding custody times did not rise to the level of an inability to agree on basic child-rearing issues. *Nielson*, 163 Mich App at 434-435. In *Dailey v Kloenhamer*, 291 Mich App 660, 666; 811 NW2d 501 (2011), sole legal custody was warranted because the parents not only could not agree on the proper educational course for the child, their disagreements had interfered with the child's medical treatment, directly implicating their ability to provide the child with medical care under MCL 722.23(c). Notably, "the parties had placed a priority on their efforts to document their actions and their disagreements, while the child's medical and educational care had been relegated to an apparently secondary concern." *Id*. at 668.[7]

The evidence here is that defendant did not immediately inform plaintiff that she had relapsed on drugs in 2016, that she had broken up with a partner, and that she had moved to a shelter. Plaintiff opined that defendant needed his permission to take KH to the domestic violence shelter with her. We disagree: a custodial parent does not need the other parent's permission to change partners or remove herself and a child from a dangerous situation.[8] The evidence also reflected that plaintiff was largely uninvolved in KH's education and medical care, and his lack of involvement was seemingly because he simply made no attempt to become involved. The evidence also reflected that he chose not to communicate with defendant directly, instead routing communications through his wife or defendant's partners. Indeed, plaintiff stated that if defendant

---

[7] This Court also specifically held that there is no statutory prohibition against awarding the parents joint physical custody while also awarding one parent sole legal custody. *Dailey*, 291 Mich App at 670. As will be discussed below, however, doing so should be a last resort.

[8] According to plaintiff's testimony, KH brought up to plaintiff that she had been at the domestic violence shelter and that "she liked it for the fact that they had a lot of toys there." KH does not appear to have suffered any actual harm as a result of spending time at the shelter. We note that although the trial court chastised defendant for failing to keep plaintiff informed of her move to the shelter, it never gave any hint that it agreed with plaintiff that she required his *permission* to go there or to take KH to the shelter with her. Indeed, the trial court strongly implied that any such attempt by plaintiff to control defendant would be inappropriate.

and her former partner were still together, plaintiff would "absolutely not" have moved to change custody.

The evidence showed that defendant made educational and medical appointments and decisions and kept plaintiff informed about those appointments and decisions. Furthermore, plaintiff had access to the school's app and was not precluded from involving himself in KH's education. Notwithstanding plaintiff's testimony that things were "[defendant's] way or no way," there was no evidence that the parties had a *disagreement*, or that plaintiff attempted to make decisions for KH only to be thwarted by defendant. Rather, plaintiff apparently just went along with those decisions, and his testimony emphasized that his concern was mostly that he had not been informed about defendant's moves. At the most, he believed it was unhealthy for KH to move so frequently because she needed more stability.[9]

We do not disagree with the trial court's conclusion that parents should be informed of their children's living situations. We are unable to find it against the great weight of the evidence that defendant should have kept plaintiff better informed about where KH was living at any particular time. However, defendant was not obligated to inform plaintiff of her location at the domestic violence shelter or seek plaintiff's permission. Furthermore, the evidence does not appear to support a finding that the parties had the kind of irreconcilable clash of beliefs as to major decisions affecting KH's well-being as in *Fisher* and *Dailey*. Plaintiff's frustration with being kept out of the loop—despite never missing any parenting time and having made no effort to keep himself *in* the loop—culminated in plaintiff resorting to self-help and violating a court order by refusing to return KH to defendant. We again do not disagree with the trial court that defendant's response to that self-help did not improve the situation, and both parties contributed to traumatizing KH in the process; nevertheless, plaintiff was the clear instigator. Plaintiff's concern with KH having a stable environment is not inappropriate, but penalizing a parent for freeing herself from an abusive environment is inappropriate, as is resorting to a unilateral violation of a court order. Furthermore, entering a new relationship, by itself, is simply the kind of "normal life change," see *Vodvarka*, 259 Mich App at 513, that will not constitute a "change of circumstances" for purposes of revisiting custody.[10]

Furthermore, the trial court seemingly conflated the issues of whether there was an established custodial environment and whether the parties' conduct was incompatible with joint legal custody. Joint legal custody was established by the judgment of divorce, although the trial

---

[9] We do not necessarily take issue in the abstract with the trial court's concern that defendant had a history of improperly hiding information from plaintiff that she felt might appear unfavorable. However, she was not obligated to disclose the shelter's address to anyone other than the Friend of the Court (which she did), and she was certainly not obligated to disclose personal information that did not affect KH's health and safety (which the move to the shelter did not). Furthermore, the trial court clearly gave that concern undue weight, given that plaintiff openly acknowledged that he sought a change of custody only because defendant left her former partner.

[10] We also find concerning plaintiff's demand to make defendant's former partner an emergency contact for KH at her school, despite defendant having left that former partner due to being abused by that former partner.

court properly did not regard that judgment as dispositive by itself. See *Marik v Marik*, 325 Mich App 353, 370; 925 NW2d 885 (2018). However, presuming the evidence reflected a functional absence of joint legal custody, the evidence did not support a finding of no established custodial environment. Pursuant to MCL 722.27(1)(c):

> The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered.

The parents' ability and inclination to cooperate with each other does not intrinsically affect any of the above considerations. Furthermore, the evidence showed that defendant had, for an appreciable time, an established history of making major decisions for KH. On this record, the evidence simply cannot support a finding that there was no established custodial environment with defendant relevant to physical *or* legal custody, nor can the evidence support any finding of proper cause or change of circumstances.[11]

It is important to keep in mind that when parents who share joint legal custody cannot agree on an important decision affecting the welfare of their child, the trial court's role is ordinarily to determine that issue in the best interests of the child. *Pierron*, 282 Mich App at 246-247. Rescinding joint legal custody in favor of sole custody may be the best solution under some circumstances. See *Fisher*, 118 Mich App at 233-234; *Dailey*, 291 Mich App 660, 666-668. However, ordering a change to sole legal custody should only be a last resort where no realistic alternative exists. *Pierron*, 282 Mich App at 262-263. The record does not convincingly show that no realistic alternative existed here, and as discussed, the focus must be on how any such conflicts affect the child rather than one or the other (or both) of the parents.

We note briefly that were we to review the trial court's findings regarding the statutory best-interests factors, we would not agree with all of them. However, the trial court was, on the basis of a multitude of independent errors, precluded from reaching the best-interests factors in the first place. We also note that we are gravely concerned by the trial court's statements on the record to defendant, essentially dictating to her that she must comport with whatever plaintiff required without any recourse or protection, and the trial court continued that order despite clear evidence on the record that plaintiff immediately proceeded to abuse his authority when given sole legal custody. Nevertheless, we ultimately need not determine whether these issues would have also merited reversal.

The trial court's order changing KH's legal custody to be exclusively with plaintiff is reversed, and the matter is remanded for further proceedings not inconsistent with this opinion. We caution that if legal or physical custody is further considered, it would be improper and impermissible to use the erroneous change of legal custody that gave rise to this appeal, or any of

---

[11] We recognize that the trial court has a more extensive history with the parties than may be reflected in the record provided to us on appeal, but our consideration is limited to that record.

-14-

the consequences thereof, to "bootstrap" a finding of just cause or change of circumstances at any future date.  We do not retain jurisdiction.

/s/ Amy Ronayne Krause
/s/ Colleen A. O'Brien